NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 60

No. 2019-015

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Christina Marie Allcock | September Term, 2019 |

Michael R. Kainen, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Allison N. Fulcher of Martin & Delaney Law Group, Barre, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Robinson and Eaton, JJ., and Dooley and Skoglund, JJ. (Ret.),
Specially Assigned

¶ 1.  **ROBINSON, J.**  Defendant appeals her convictions for aggravated assault on a police officer, simple assault on a police officer, and impeding a police officer.  She argues that her conviction for aggravated assault on a police officer must be reversed because the trial court erred in admitting Facebook messages that were not properly authenticated, and that the trial court should not have allowed the State to alter the elements of the impeding charge after the evidence was closed.[1]  We reverse the conviction of aggravated assault and affirm the convictions of simple assault and impeding a police officer.

---

[1] Defendant's argument on appeal with respect to the simple assault charge applies only if we accept defendant's argument with respect to both other charges.  Because we affirm the

¶ 2.    The evidence at trial, viewed in the light most favorable to the State, reflects the following. Law enforcement responded to an emergency call in March 2015 and discovered a man stabbed in defendant's residence. Defendant, her boyfriend, her parents, and her adult son were present when the officers responded to the call. While the officers were investigating the scene, defendant and some of the others left the residence and went to sit in defendant's father's car, which was parked outside. At some point an officer approached the vehicle, where defendant, her boyfriend, and her son were sitting in the back seat of the car. The doors were unlocked. When the officer tried to persuade defendant's son to get out of the car to speak with him, defendant resisted. The officer testified at trial that defendant wrapped her arms around her son to prevent his exit; yelled at the officer; "slapp[ed]," "claw[ed]," and "gouged" his hands; held a lighter, which was lit, against his hand; and punched him in the mouth. Another officer also testified that defendant held the lighter against the first officer's hand and sleeve.

¶ 3.    This altercation gave rise to charges of aggravated assault on a police officer, 13 V.S.A. §§ 1024(a)(1), 1028(a)(1), simple assault on a police officer, id. §§ 1023(a)(1), 1028(a)(1), and impeding a police officer, id. § 3001.[2] The jury found defendant guilty on all counts. Defendant filed a motion for a new trial under Vermont Rule of Criminal Procedure 33 on the aggravated-assault charge, and a motion for judgment of acquittal under Rule 29 on the simple-assault and impeding-officer charges. The court denied both motions. The court sentenced defendant to concurrent sentences of eighteen months to six years for the aggravated assault,

---

impeding conviction, we need not address defendant's argument concerning the simple assault charge.

[2] Per the trial court's instructions to the jury, the aggravated assault charge relates to defendant's use of the cigarette lighter against the officer. The simple assault and impeding charges relate to defendant's other acts in attempting to prevent the officer from questioning her son. The scope of the court's instruction as to these latter two charges is central to the second issue on appeal. See infra, ¶ 4.

twelve to twenty-four months for the simple assault, and eighteen months to three years for the impeding-officer offense.

¶ 4. Defendant timely appeals her convictions, arguing that the court erred (1) in admitting Facebook messages purportedly written by her and (2) in allowing the State to alter the elements of the impeding charge after the evidence was closed. We address each argument in turn.

I. Authentication of Facebook Messages

¶ 5. Defendant argues that the trial court erred in admitting inculpatory Facebook messages purportedly authored by defendant. Specifically, she argues that the State failed to properly authenticate the messages as written by her, and that this Court must accordingly reverse the conviction for aggravated assault of an officer. Additional facts relevant to this argument are as follows.

¶ 6. During trial, the State moved to admit a "Facebook Business Record" that included the following private messages sent from a Facebook account with defendant's name: "I didn't hit the cop either . . . I did take a lighter to his ha[n]d after he assaulted me . . . But it was fine cause he tried pulling me around by my hair after." The Facebook user also stated that a newspaper incorrectly reported that the homicide victim was unresponsive when police arrived, stating that "they lied . . . Or had the facts wrong," and, "Also says he was stabbed multiple times which is also untrue." Law enforcement officers testified that they learned of these messages when the recipient contacted the police and provided screenshots of the messages on his phone. Some testimony suggested that police viewed the public Facebook profile, but the testifying officer did not remember what information was private and what was public. The police then executed a search warrant and obtained data from Facebook regarding the page registered in defendant's name, in the form of the Facebook Business Record. The record listed the account holder's name, email addresses, phone numbers, and internet protocol (IP) addresses. It identified "Christina

3

Allcock" as the account holder, but there was no testimony at trial about whether the listed email addresses, phone numbers, and IP addresses belonged to defendant.

¶ 7. The trial court admitted the Facebook record over defendant's objection. After the trial, defendant filed a motion for a new trial, again challenging the authentication of the Facebook messages. See V.R.Cr.P. 33. The court denied the motion. It stated:

> There are essentially three authentication foundation facts:
>
> - What was on the Facebook site is what is being produced
> - The owner of the site
> - Were the posts authored by the person who purports to author them
>
> The first fact was established by the police testifying that the printout came from a warrant served on Facebook. The second fact requires some proof establishing that the site belonged to or was set up by [defendant]. Here, police were directed to the site by a source who ended up being the person [defendant] appeared to be chatting with. They checked the public profile on the site to confirm that it was [defendant's], and they served a warrant demanding the information from [defendant's] site. The State barely meets this hurdle. However, in looking at the totality of the evidence, there is circumstantial evidence that this was [defendant's] site. The character and contents of the dialogue is consistent with the site belonging to [defendant]. This is closely related to the requirement that there be some evidence that the posts were made by [defendant]. The writer's awareness of the facts of the case as shown in the details of the post are consistent with their being made by [defendant].

Thus, the court concluded that the State "got over the gate" for purposes of its gatekeeping function under Vermont Rule of Evidence 104. However, it noted that the jury had struggled with intent in its deliberations, first asking about the difference between "intent" and "conscious objective" and then following up to ask whether defendant could have more than one conscious objective. As a result, the court explicitly found that "intent was a sufficiently close call, that any evidence could have tipped the balance. If the court's evidentiary ruling on Facebook was in error, it was not harmless."

4

¶ 8.     On appeal, defendant challenges her aggravated-assault conviction, arguing again that there was an insufficient foundation to authenticate the statements in the Facebook document as defendant's, and that the trial court's error in admitting the evidence was not harmless. She argues in part that there is an "inherent danger" in social media communications because "anyone can create a fictitious account under another person's name or gain access to another's account by obtaining the user's username and password." The State responds that most courts have not created any special authentication requirements for social media communications and here the trial court did not err in admitting the Facebook messages because the evidence was sufficient to authenticate the messages as defendant's. "A trial court's evidentiary rulings are left to its sound discretion, and we will not reverse absent an abuse of that discretion." State v. Muscari, 174 Vt. 101, 107, 807 A.2d 407, 412 (2002).

¶ 9.     We hold that the authentication of social media accounts should be assessed under the same standard as any other evidence: a threshold determination of whether "sufficient evidence exist[s] to 'support a finding that the matter in question is what its proponent claims.' " State v. Kelley, 2016 VT 58, ¶ 19, 202 Vt. 174, 148 A.3d 191 (quoting V.R.E. 901(a)). However, even under that standard, we hold that the admission of the Facebook messages was an abuse of discretion. Because we agree with the trial court that the error was not harmless, we reverse as to the aggravated-assault conviction.

A.  Standard for Authentication

¶ 10.     The applicable standards for authentication are well established and apply to a wide variety of records. Defendant cites several state decisions noting the complexity of authenticating social media communications and applying special and relatively heightened standards to authenticating such communications. See, e.g., Griffin v. State, 19 A.3d 415, 421-23 (Md. 2011); Commonwealth v. Williams, 926 N.E.2d 1162, 1172-73 (Mass. 2010). However, she correctly notes, as does the State, that numerous other state and federal courts have declined to impose a

5

heightened standard of authentication in these circumstances. For the reasons set forth below, we hold that the typical authentication rules are sufficient for social media communications, although we emphasize that courts must be careful not to treat social media accounts as any more self-authenticating than other comparable communications.

¶ 11. Under Vermont Rule of Evidence 901(a),[3] authentication requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." This is merely a "preliminary" determination, and as such, " 'the test for authenticating evidence is not a demanding one.' " Kelley, 2016 VT 58, ¶ 19 (quoting Muscari, 174 Vt. at 107, 807 A.2d at 413). The proponent of the evidence need not show with "absolute certainty" that the evidence is what it is claimed to be. State v. Pratt, 2015 VT 89, ¶ 33, 200 Vt. 64, 128 A.3d 883. Rather, the proponent need only show the proffered evidence's authenticity with "reasonable certainty." Kelley, 2016 VT 58, ¶ 20 (quotation omitted). Once admitted, "the definitive resolution of authenticity is left to the jury." Id. ¶ 19; see also Parker v. State, 85 A.3d 682, 688 (Del. 2014) (explaining that authenticity standard presents "preliminary question for the trial judge to decide" and "[i]f the [j]udge answers that question in the affirmative, the jury will then decide whether to accept or reject the evidence").

¶ 12. Rule 901(a) provides a nonexhaustive list of methods to authenticate evidence. These methods include the testimony of a witness with knowledge, comparison to authenticated specimens, and the "[a]ppearance, contents, substance, internal patterns, or other distinctive

---

[3] Vermont Rule of Evidence 901 is nearly identical to its counterpart in the Federal and Uniform Rules of Evidence. Reporter's Notes, V.R.E. 901. "[F]ederal cases, or cases in the courts of states which have adopted the Uniform or Federal Rules, are an authoritative source for the interpretation of identical provisions of the Vermont Rules." Reporter's Notes, V.R.E. 101; see also State v. Wheel, 155 Vt. 587, 603, 587 A.2d 933, 943 (1990) (relying on federal case law in interpreting Vermont rule of evidence because Vermont rule is "virtually identical to its federal counterpart and federal cases 'are an authoritative source for the interpretation of identical provisions of the Vermont Rules' " (citation omitted) (quoting Reporter's Notes, V.R.E. 101)). In this opinion, we cite to cases from federal courts interpreting the Federal Rules of Evidence and to cases from state courts interpreting nearly identical rules.

characteristics, taken in conjunction with circumstances." V.R.E. 901(b)(1)-(4). In <u>State v. Kelley</u>, for example, this Court upheld the admission of a recording of the complainant's 911 call based on an officer's testimony that he had previously met the complainant and heard her voice on the phone; that he had listened to the recording and identified the voice as the complainant's; and that the complainant identified herself in the recording. 2016 VT 58, ¶ 21.

¶ 13. While some courts have voiced concerns about authenticating social media communications, see, e.g., <u>Parker</u>, 85 A.3d at 685-86; <u>Sublet v. State</u>, 113 A.3d 695, 712 (Md. 2015); <u>Griffin</u>, 19 A.3d at 423, most courts have determined that "the rules of evidence already in place for determining authenticity" are sufficient for evaluating the authenticity of social media evidence. <u>Tienda v. State</u>, 358 S.W.3d 633, 638-39 (Tex. Crim. App. 2012). As one noted:

> Courts and legal commentators have reached a virtual consensus that, although rapidly developing electronic communications technology often presents new and protean issues with respect to the admissibility of electronically generated, transmitted and/or stored information, including information found on social networking web sites, the rules of evidence already in place for determining authenticity are at least generally adequate to the task.

<u>Id</u>. (quotation omitted) (citing case law and commentators); see also <u>Parker</u>, 85 A.3d at 687 ("Although we are mindful of the concern that social media evidence could be falsified, the existing Rules of Evidence provide an appropriate framework for determining admissibility."); <u>State v. Hannah</u>, 151 A.3d 99, 106 (N.J. Super. Ct. App. Div. 2016) (reasoning that "a tweet can be easily forged, but so can a letter or any other kind of writing" and declining to "create a new test for social media postings"). Even the Maryland Court of Appeals, which reasoned in <u>Griffin</u> that "greater scrutiny" was required in evaluating the authenticity of social media communications, 19 A.3d at 423, has since concluded that the established rules of evidence are sufficient to evaluate the authenticity of social media evidence. See <u>Sublet</u>, 113 A.3d at 717-18 (adopting standard set forth in <u>United States v. Vayner</u>, 769 F.3d 125, 129-31 (2nd Cir. 2014), which relied on traditional rules of evidence to evaluate authenticity of social media evidence).

¶ 14. We agree that trial courts should evaluate the authenticity of social media communications under the same standard as other evidence. Social media evidence can be forged, but that does not make it unique; "the risk of forgery exists with any evidence . . . ." Parker, 85 A.3d at 686. Our existing rules of evidence recognize this risk, provide for the court to admit only such evidence for which there is a sufficient showing of authenticity, and trust the jury "to ultimately resolve issues of fact." Id.; see also Kelley, 2016 VT 58, ¶ 19 ("[O]nce the court decides sufficient evidence exists to support a jury finding, the definitive resolution of authenticity is left to the jury."). "Where a proponent seeks to introduce social media evidence, [the party] may use any form of verification available under Rule 901—including witness testimony, corroborative circumstances, distinctive characteristics, or descriptions and explanations of the technical process or system that generated the evidence in question—to authenticate" social media communications. Parker, 85 A.3d at 687-88.

¶ 15. However, in determining the authenticity of social media evidence, courts must be sure not to apply a more lenient standard of authenticity compared to other types of documents. A mere assertion that a Facebook page belongs to a specific person is no more self-authenticating than a flyer posted in a public square that includes the statement, "This message is from Jane Doe." Absent sufficient other evidence that such a flyer was, in fact, written by or on behalf of Jane Doe, the statements in the flyer would not be admissible as Jane Doe's statements. For the reasons set forth below, the Facebook messages in this case are not meaningfully distinguishable from the hypothetical flyer, and are thus inadmissible.

B. Application to Facebook Messages

¶ 16. Applying the above standards, we conclude that the State did not offer sufficient evidence to authenticate the messages. The State points to five facts to authenticate the Facebook Business Record: that the Facebook page from which the messages were sent is associated with someone named "Christina Allcock," that the Facebook account is registered to "Christina

8

Allcock," that the purported recipient contacted the police, that the police concluded the account belonged to defendant, and that the messages contained information about the case. As explained in detail below, these facts are insufficient to authenticate the messages in this case. Assuming the messages at issue were authentic, it would have been very easy for the State to authenticate them through a number of strategies, but it failed to do so here. Questions of authentication should generally be left to the jury, but under our rules of evidence, the trial court has a role to play as gatekeeper. The trial court in this case failed to fulfill this role.

¶ 17. First, the messages cannot be authenticated merely by the fact that the account from which the messages were sent purported to be that of defendant Christina Allcock. Defendant does not dispute that the Facebook messages were sent from an account that, on its face, purported to be in her name. However, that fact alone is not sufficient to support admission of the messages. See 2 R. Mosteller et al., McCormick on Evidence § 221 (8th ed.) (explaining that "the purported signature or recital of authorship on the face of a writing is not sufficient proof of authenticity to secure the admission of the writing into evidence"). Digital communications are no different from other writings in this regard. The "judicial skepticism toward the recital of authorship in documents" is viewed as a "necessary check on the perpetuation of fraud." Id.

¶ 18. It is not only theoretically possible for a person to set up a social media account purporting to belong to someone else; it is relatively common. By November 2019, Facebook had removed more than five billion fake accounts in 2019, up from 3.3 billion in 2018. B. Fung & A. Garcia, Facebook Has Shut Down 5.4 Billion Fake Accounts this Year, CNN Bus. (Nov. 13, 2019, 3:57 PM), https://www.cnn.com/2019/11/13/tech/facebook-fake-accounts/index.html [https://perma.cc/XF3Q-LJ3X]; see also Community Standards Enforcement Report, Facebook Transparency, https://transparency.facebook.com/community-standards-enforcement#fake-accounts (last visited July 1, 2020) (estimating that fake accounts represent approximately five percent of worldwide monthly active Facebook users).

¶ 19. Courts and commentators have recognized this reality. See, e.g., Griffin, 19 A.3d at 421 ("[A]nyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password."); see also I. Robbins, Writings on the Wall: The Need for an Authorship-Centric Approach to the Authentication of Social-Networking Evidence, 13 Minn. J.L. Sci. & Tech. 1, 8 (2012) (explaining that many social-networking sites prohibit users from creating profiles that impersonate others, but "there is effectively no check on false accounts or false profiles, unless someone lodges a complaint with the social-networking company"); G. Fahimy, Comment, Liable for your Lies: Misrepresentation Law as a Mechanism for Regulating Behavior on Social Networking Sites, 39 Pepp. L. Rev. 367, 392 (2012) ("In sum, misrepresenting, masquerading, and lying are common in every day social networking use.").

¶ 20. Second, the fact that the Facebook Business Record showed that the account was registered in defendant's name likewise does not provide sufficient information from which a jury could conclude that the account belonged to defendant and that she sent the messages at issue. It proves that the messages were sent from an account that purportedly belongs to defendant—but that fact was and is undisputed. As noted above, anyone can register an account in another's name. The critical question for purposes of authentication is whether the account did in fact belong to defendant. That the person who created the account represented to Facebook that they were Christina Allcock is no more probative on this question than the fact that they represented to the world that the Facebook page was Christina Allcock's. This is not to say that the Facebook Business Record could not be helpful in authenticating such posts. The record, admitted as an exhibit, contained information from which law enforcement could have readily connected the account to defendant, if in fact it was hers. But the State offered no testimony tying the IP address listed in the record to defendant.

10

¶ 21. Third, the fact that police were directed to defendant's site by a person who purportedly messaged with defendant does not advance the analysis at all. At trial, a trooper involved in the investigation testified that "we received a phone call from an individual that had some information, and that information related to some social media communications." The trooper named the individual, but provided no further information about him. The trooper testified that this person provided screenshots from his phone, and that the Facebook messages at issue were sent to the individual. That is the extent of the evidence concerning the individual who received the messages from the "Christina Allcock" Facebook account. There is no dispute that the messages were sent from the "Christina Allcock" account to this individual. The question for purposes of authentication is whether there is sufficient evidence that defendant actually sent the messages from the "Christina Allcock" account. The recipient did not testify about his basis for believing that the messages in question did, in fact, come from defendant; in fact, there is no record evidence that he even held such a belief. In short, as to the question whether the messages could be authenticated as having come from defendant, the trooper's passing reference to a report from a person who received the messages adds nothing.

¶ 22. Similarly, the fact that the police officers reviewed the Facebook account at issue and concluded that it was defendant's is irrelevant. The question before the court was whether there was sufficient evidence from which the jury could conclude that defendant sent the messages at issue. The police officers' conclusion that there was evidence connecting the messages to defendant is not evidence; the police essentially answered for themselves the same question, or a close cousin, as the question before the trial court. The evidence supporting the officers' conclusion that defendant sent the messages may be highly relevant to the question before the court, but the court must evaluate that evidence itself. The conclusions the police drew from whatever undisclosed evidence exists are irrelevant.

11

¶ 23. Finally, without further evidence, there is nothing about the content of the messages that authenticates them as having been written by the defendant. The trial court suggested that the messages contained facts that showed the author was intimately familiar with the events at issue. If the evidence supported this assertion, that could authenticate the communications. But the record on this point is mixed at best. The messages at issue were part of an exchange on March 2, 2015—the day after the events leading to these charges. In the course of the back and forth, the messenger who was using an account attributed to "Christina Allcock" said, "I didn't hit the cop, either;" "I did take a lighter to his had (sic) after he assaulted me;" and, "But it was fine cause he tried pulling me around by my hair after." In response to the recipient's references to the newspaper reports that the victim was unresponsive when police arrived, the messenger wrote, "Because they lied . . . Or had the facts wrong." The sender added, "Also says he was stabbed multiple times which is also untrue." If the allegations that defendant allegedly hit an officer and burned his hand were not yet in the public record, the messenger's description of the allegations could support a jury's determination that the messages were written by defendant. Likewise, if the assertion that the newspaper was incorrect in reporting that the victim had multiple stab wounds was correct, then a jury could infer that defendant wrote the messages. But the evidence does not bear out these inferences. The State offered no evidence as to whether the public reports about the incident preceding the exchange of messages included the details described by the messenger. The State offered no evidence that the messenger's claims contradicting the public accounts of the crime were true. In short, while the State's theory of authentication is a sound one, it failed to offer the evidence necessary to prove its case.

¶ 24. If the messages were authentically from defendant, the State could easily have offered sufficient testimony to allow the jury to consider the question. It could have called the recipient of the messages as a witness, asking him how he knew defendant and why he believed the messages were from her. See, e.g., Cotton v. State, 773 S.E.2d 242, 245 (Ga. 2015) (holding

that Facebook account was adequately authenticated as belonging to defendant based in part on testimony that witness had engaged account holder in virtual conversations from which she was able to discern his identity); People v. Downin, 828 N.E.2d 341, 350-51 (Ill. App. Ct. 2005) (concluding that email communications were sufficiently authenticated as belonging to defendant where witness sent email to address she always used to communicate with defendant, she received a responsive reply from that email address, and the reply contained information known exclusively to witness and defendant); State v. Green, 830 S.E.2d 711, 715 (S.C. 2019) (holding that content of messages was sufficient to authenticate that co-conspirator wrote them based on circumstantial evidence).

¶ 25.     The State could have presented evidence that the Facebook page associated with the account in question had distinct information or personal photos not in the public domain.  See, e.g., Nicholson v. State, 837 S.E.2d 362, 370 (Ga. 2019) ("The . . . showing required to admit printouts from a Facebook account may be established by circumstantial evidence of distinctive characteristics of the account that identify its owner.").  Or the State could have connected to defendant the IP address associated with the messages.  See, e.g. United States v. Hassan, 742 F.3d 104, 133 (4th Cir. 2014) (screenshot of Facebook pages sufficiently authenticated by tracking Facebook pages and Facebook accounts to individuals' mail and email addresses through IP addresses); Nicholson, 837 S.E.2d at 371 (citing fact that IP address linked to account in question was located in town where defendant lived as factor supporting authentication).  Or the State could have presented evidence that the messages at issue contained information about the events leading to defendant's arrest that were not yet in the public domain.  See, e.g., Sublet, 113 A.3d at 720 (noting that messages "were written by someone with knowledge of and involvement in the situation, which involved only a small pool of individuals").  But the State did none of these things.

¶ 26.     The weight to be given to the State's evidence as to the authenticity of the messages is ultimately a question for the jury, but the court must play a gatekeeping role.  "Preliminary

13

questions concerning . . . the admissibility of evidence shall be determined by the court . . . ." V.R.E. 104(a). The court need not be convinced that the evidence is what it purports to be, but must conclude that there is evidence upon which a reasonable jury could reach that conclusion. For the reasons set forth above, there was no such evidence here.

¶ 27. Moreover, as the trial court found, the jury's difficulty with the question of intent makes it clear that the error was not harmless. The messages that were admitted into evidence include an inculpatory statement concerning defendant burning the officer with a lighter—the act on which the aggravated assault charge was based. We therefore reverse defendant's conviction of aggravated assault of a law enforcement officer.

## II. Amendment of Information

¶ 28. Defendant's second argument is that the trial court erred in allowing the State to alter the third charge of impeding an officer after the evidence was closed. In particular, in instructing the jury as to the elements of the charge of impeding an officer, the trial court instructed the jury that it could convict on the basis of defendant "slapping" the officer. The charging documents had described defendant as scratching or punching the officer, but did not refer to "slapping." Because the addition of the word "slapping" to the charges did not add or alter a charge, and did not prejudice defendant, we find no error and affirm the conviction for impeding.[4] Additional facts relevant to this argument are as follows.

¶ 29. The information alleged generally that defendant committed the offenses of aggravated assault on an officer, simple assault on an officer, and impeding an officer, but did not

---

[4] Defendant's argument with respect to the simple assault count is that absent the distinct element of "slapping" that the court included in the instruction on the impeding charge, and the distinct element of "attempting to burn," which was prejudiced by the Facebook messages, the "law of the case" is that the simple assault charge and the impeding charge would be duplicative and the State would be required to elect between the charges. Because we reject defendant's challenge to the court's inclusion of "slapping" in connection with the impeding charge, we do not address defendant's argument on this point.

14

associate specific acts with each of these charges. Two affidavits of probable cause accompanied the information and set forth the specific allegations. In one of the affidavits, the officer primarily involved in the altercation alleged the following:

> As I tried to encourage [defendant's son] to leave the vehicle, [defendant] assaulted me with her hands (<u>punching and gouging my hand and arms</u>) and used her lighter to burn my hand and used the lighter in an attempt to light my jacket sleeve a number of times . . . . As [the other officer] and I remove[d] [defendant's son] from the vehicle[,] [defendant] reached over his right shoulder and punched me once in the mouth. I grabbed the hand that punched me, allowing me to identify [defendant] as the one who hit me.

(Emphasis added.)

¶ 30. The State's attorney did not identify the specific acts underlying the impeding-officer charge in the preliminary jury instructions because she wanted to wait and see "how the evidence would come in." During his testimony, the officer quoted above testified:

> At one point, . . . I put my . . . hands on [defendant's son's] upper arm to try to . . . encourage him and [defendant] began <u>slapping my hands</u>, you know, "get the eff away from me," you know, et cetera, et cetera . . . . I began pulling on his arm, [defendant] began clawing my hand, "let go of him." . . . At one point she gouged my hand . . . . I feel something on this part of my hand and I pull it back. And I realize it's a lighter that [defendant] is holding . . . . It caused me to pull my hand back. . . . [A]s we're pulling [defendant's son] out, I get a, what I know now, is a punch square to the mouth . . . . I grabbed the arm that punched me, and . . . it was [defendant's] arm . . . . [S]he hit me square in the mouth . . . with her fist.

(Emphasis added.)

¶ 31. After the close of evidence, in response to objections from defendant that the simple assault and impeding charges were duplicative, the State's attorney proposed including "slapping" as part of the basis for the impeding-officer charge.[5] Defendant objected. After an extended

---

[5] We do not consider whether the double jeopardy concerns that gave rise to this amendment to the charges were well founded, nor whether, if they were, the amendment to the impeding charge resolved the problem.

15

discussion, the court instructed the jury that in order to convict defendant on the impeding-officer charge, they had to find that defendant "knowingly hindered" the officer by "scratching, punching, slapping, or lighting, or attempting to light" the officer. The court gave the jury a verdict form and directed the jury to specify which acts they unanimously agreed supported the conviction or convictions, if they found defendant guilty. The jury found defendant guilty on all counts and indicated on the verdict form with respect to the impeding count that they unanimously agreed that defendant engaged in each of the alleged acts of slapping, attempting to burn with a lighter, punching, and scratching the officer.

¶ 32.    After the verdict, defendant filed a motion for judgment of acquittal on the simple-assault and impeding-officer charges, arguing in part that "the State's alteration of the language by which the crimes were charged to the jury, after the evidence had been presented, violated [defendant's] right to fair notice of the allegation(s) against [her]."[6] See V.R.Cr.P. 29(c). The trial court denied defendant's motion, reasoning that the affidavit supporting the charges alleged "that [defendant] punched, scratched, slapped, and attempted to burn" the officer. In addition, it found that "the defense was on notice that [defendant] slapped or gouged [the officer]" because the officer "testified to it."

¶ 33.    On appeal, defendant reiterates her argument that allowing the State to alter the impeding-officer charge to include "slapping" as a basis of conviction violated the Vermont Rules of Criminal Procedure and her due process right to fair notice of the allegations against her. She objects that there was no allegation in the information or its accompanying affidavit that defendant "slapped" the officer, and she was unprepared to cross-examine the officer about this alleged act. The State concedes that "[a]lthough the court did not formally amend the information, the

---

[6] Although the motion referred broadly to the change to the language "by which the crimes [plural] were charged to the jury," defendant's argument in the post-judgment motion and on appeal relate solely to the court's instruction on the impeding charge.

specification of what acts constituted the offense for purposes of the jury instructions had this effect." We review the court's decision to allow the State to amend the information for abuse of discretion. See State v. Brean, 136 Vt. 147, 150, 385 A.2d 1085, 1087 (1978).

¶ 34. "Under [Vermont Rule of Criminal Procedure] 7(d), the trial court may permit an information to be amended at any time after trial has commenced and before verdict for any purpose 'if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.' " Id. at 149, 385 A.2d at 1087 (quoting V.R.Cr.P. 7(d)). As we have explained:

> [T]he rule that an information can be amended during trial if no different offense is charged is based on the firmly established requirement[] . . . that the accused shall be informed of the charge with such particularity that [she] will be able to prepare [her] defense intelligently and will not be taken by surprise by the evidence adduced at trial . . . .

State v. Burclaff, 138 Vt. 461, 464, 418 A.2d 38, 40 (1980) (citations omitted) (noting that rule is also intended to protect defendant from multiple prosecutions for same offense); see also State v. Phillips, 142 Vt. 283, 288, 455 A.2d 325, 328 (1982) (holding that criminal defendant has constitutional right "to be informed of the cause and nature of the accusation against [her]" and therefore information must "set[] forth charges with such particularity as will reasonably indicate the exact offense the accused is charged with, and will enable her to make intelligent preparation for her defense" (quotations and alteration omitted)). In evaluating whether defendant was provided sufficient notice of the charges against her, "the information . . . must be read in conjunction with the accompanying affidavit of probable cause." In re Carter, 2004 VT 21, ¶ 13, 176 Vt. 322, 848 A.2d 281.

¶ 35. We find no abuse of discretion here. Defendant is correct that the affidavit accompanying the initial information did not use the word "slap." But amending the information to include "slapping" did not charge an additional or different offense and did not cause defendant

17

prejudice. See V.R.Cr.P. 7(d). The affidavit alleged that defendant "assaulted [the officer] with her hands," elaborating that defendant was "punching and gouging" the officer's "hand and arms." At trial, the officer testified to the same event, this time saying that defendant "began slapping [his] hands" and "gouged [his] hand." The change from "punching and gouging" to "slapping" and "goug[ing]" is negligible. Defendant had sufficient notice of what the State alleged and had opportunity to cross-examine the testifying officer regarding the alleged slapping. See State v. Loso, 151 Vt. 262, 265-66, 559 A.2d 681, 684 (1989) (upholding mid-trial amendment of information because amendment made same allegation as affidavit that accompanied initial information and therefore defendant was able to "prepare intelligently for his defense"); cf. State v. Beattie, 157 Vt. 162, 170, 596 A.2d 919, 924 (1991) (holding pretrial amendment of information alleging defendant was in physical control of vehicle did not prejudice defendant in preparing for trial because affidavit provided at arraignment alleged that defendant was in physical control of vehicle). The trial court did not abuse its discretion in allowing the State to amend the impeding-officer charge. See Brean, 136 Vt. at 150, 385 A.2d at 1087.

Defendant's conviction of aggravated assault on a law enforcement officer is reversed and remanded. The other two convictions are affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 36. **REIBER, C.J, dissenting.** I would hold that the trial court did not abuse its discretion in admitting the Facebook messages. There was a sufficient showing of authenticity for admission. Accordingly, I respectfully dissent from that portion of the majority's decision. I join with the majority in its holding that the trial court did not abuse its discretion in allowing the State to amend the impeding-officer charge.

18

¶ 37.   In general, I agree with the majority's standard for authentication.  As the majority states, our established rules of evidence are sufficient to evaluate the authenticity of social media communications, and we need not adopt a more stringent standard.  According to those established rules, the court's role in authenticating evidence is a threshold determination.  See V.R.E. 104(a)-(b); Reporter's Notes, V.R.E. 901.  The trial court itself "need not be persuaded that the proffered evidence is authentic."  Tienda v. State, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012).  The court merely decides "[t]he preliminary question," which "is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence [the party] has proffered is authentic."  Id.  Ultimately, the jury decides "whether to accept or reject the evidence."  Parker v. State, 85 A.3d 682, 688 (Del. 2014); see also State v. Kelley, 2016 VT 58, ¶ 19, 202 Vt. 174, 148 A.3d 191 ("[T]he definitive resolution of authenticity is left to the jury.").

¶ 38.   As a threshold determination, "the test for authenticating evidence is not a demanding one."  Kelley, 2016 VT 58, ¶ 19 (quotation omitted).  "Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury."  United States v. Fluker, 698 F.3d 988, 999 (7th Cir. 2012); see also Kelley, 2016 VT 58, ¶ 20 (holding proponent need only show authenticity with "reasonable certainty" (quotation omitted)).  Any remaining "defects of proof may affect the weight accorded the [evidence], but do not control [its] admissibility."  State v. Mecier, 138 Vt. 149, 153, 412 A.2d 291, 294 (1980).  If the evidence showing authenticity is weak, "the opposing party remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its admissibility."  United States v. Vayner, 769 F.3d 125, 131 (2d Cir. 2014) (quotation omitted).

19

¶ 39.   The trial court here did not abuse its discretion in deciding that the jury could reasonably conclude the Facebook messages identified as defendant's were in fact written by her. See Parker, 85 A.3d at 688 ("[T]he trial judge as the gatekeeper of evidence may admit the social media post when there is evidence sufficient to support a finding by a reasonable juror that the proffered evidence is what its proponent claims it to be." (quotation omitted)).  The foundation evidence included testimony that police were directed to defendant's site by the person purportedly messaging with her; police had reviewed defendant's public Facebook account and determined it was hers; the "Facebook Business Record" was produced in response to a search warrant requesting information from defendant's account; and the messages purportedly authored by defendant contained facts that showed the author was intimately familiar with the events at issue. This evidence met the threshold for showing authenticity prior to admission.  See Fluker, 698 F.3d at 999-1000 (holding that government made sufficient showing that emails purportedly written by defendant were authentic based on sender's and recipient's email addresses and contents of emails, which, given circumstances of case, supported conclusion that author was associated with and "had significant knowledge" of events in case); Sublet v. State, 113 A.3d 695, 720-21 (Md. 2015) (upholding preliminary determination that social media messages were authentic because of timing of messages and because contents of messages showed they were written by someone with knowledge of events in case, which were known only by small group of individuals).  If defects of proof remained, the burden of exposing those defects lay with the opposing party.  Vayner, 769 F.3d at 131.  There was no error.

¶ 40.   The majority criticizes much of this evidence.  For example, the majority points out that the State failed to show that the details in the Facebook messages were unknown to the public; the officer's testimony about viewing the Facebook page prior to seeking a warrant was unclear about what was public and what was private; and the State provided no information about the individual who directed the police to the Facebook messages apart from his name.  The majority

also provides examples of what else the State could have done to prove the messages' authenticity, such as showing that the IP addresses linked with the Facebook account were defendant's or asking the recipient of the messages to testify. I agree the State could have done more, but that is not the question. The question is whether the evidence presented made a prima facie case that defendant wrote the messages the State claimed she did. The court did not abuse its discretion in concluding the evidence made that showing. I would affirm.

¶ 41.    I am authorized to state that Justice Eaton joins this dissent.


_____
Chief Justice