# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-030**

**Filing Date: March 11, 2021**

**No. A-1-CA-39148**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**JESENYA O.,**

Child-Appellant.

**APPEAL FROM THE DISTRICT COURT OF ROOSEVELT COUNTY**
**Donna J. Mowrer, District Judge**

Certiorari Granted, April 12, 2021, No. S-1-SC-38769. Released for Publication August 31, 2021.

Hector H. Balderas, Attorney General
Benjamin Lammons, Assistant Attorney General
Santa Fe, NM

for Appellee

Liane E. Kerr
Albuquerque, NM

for Appellant

## OPINION

**MEDINA, Judge.**

**{1}** Jesenya O. (Child) appeals her adjudications of delinquency for unlawful taking of a motor vehicle, contrary to NMSA 1978, Section 30-16D-1 (2009), and reckless driving, contrary to NMSA 1978, Section 66-8-113 (1987). On appeal, Child raises a number of issues, which we address in the following order: (1) the district court abused its discretion when it admitted Facebook messages; (2) there is insufficient evidence to support her delinquency adjudications; (3) the district court violated her constitutional rights when it denied her motion to allow witnesses to testify without face masks or, alternatively, to allow witnesses to wear plastic face shields rather than face masks; and

(4) the district court abused its discretion when it denied her motion to continue her adjudicatory hearing. We reverse and remand.

## BACKGROUND

**{2}** Late one night, Officer Andrew Olivas of the Portales Police Department responded to the Ashley Furniture store to investigate a report of a stolen vehicle. Upon arrival, Officer Olivas spoke with Jeremiah Erickson who identified Child as the culprit. The State subsequently filed a delinquency petition alleging, in relevant part, that Child committed the delinquent acts of unlawful taking of a motor vehicle and reckless driving.

**{3}** On the morning of the adjudicatory hearing, Child's counsel objected to the requirement that witnesses wear face masks, asserting that the requirement violated Child's state and federal right of confrontation. Child's counsel argued that not being able to see each witness's entire face would prejudice Child as it would make it difficult for the jury to determine credibility by limiting important non-verbal communication cues.[1] Counsel asked the district court to either allow witnesses to testify wearing plastic face shields rather than face masks, or in the alternative, to continue the trial until such time as face masks were not required.

**{4}** The district court denied Child's motions and explained that the adjudicatory hearing was proceeding pursuant to the New Mexico Supreme Court's current COVID-19 operating procedures (Supreme Court COVID-19 Order), which required that—with limited exceptions—"the use of a mask or other protective face covering that covers the nose and mouth shall be required by anyone entering and while in a courthouse, judicial building, or other physical space used, occupied, or operated by the New Mexico Judiciary[.]" Supreme Court Order No. 20-8500-17 (May 15, 2020), https://www.nmcourts.gov/wp-content/uploads/2020/12/Order-No_-20-8500-017-Requiring-Use-of-Face-Masks-in-NM-Courts-During-COVID-19-PHE.pdf.[2] The district court further stated that it had directly clarified with our Supreme Court that witnesses were in fact required to wear face masks.

**{5}** Erickson, age nineteen, testified at the adjudicatory hearing that he knew Child from high school and that they communicated with each other through Facebook Messenger. On the evening of February 25, 2020, Erickson picked Child up at her house in his parents' white Dodge Durango so they could hang out at his friend's apartment.

**{6}** According to Erickson, he, Child, and his friend hung out in the apartment and listened to music. Erickson testified that neither he nor Child drank any alcohol at the

---

1Counsel argued that the plastic shield in front of the witness stand was sufficient to protect the witnesses, as well as those seated nearby.

2As of the date of this opinion, the mask requirement remains in effect for all courthouses and judicial buildings in New Mexico. *See* Supreme Court Order No. 21-8500-003 (Feb. 12, 2021), https://www.nmcourts.gov/wp-content/uploads/2021/02/Order-No.-21-8500-003-Amending-PHE-Protocol-No.1-2-12-21-Combined.pdf.

apartment. As the evening progressed, Erickson noticed that Child started "kinda acting really weird." Around 11:00 p.m., Child announced that she was "going to go smoke with one of her friends outside," which Erickson interpreted to mean she was going to smoke marijuana. Child left the apartment and returned about fifteen to twenty minutes later.

**{7}** Child asked Erickson to take her home sometime between midnight and 1:00 a.m. During the ride home, Child directed Erickson to drive to an alley behind Ashley Furniture, which he did. Erickson described Child as "high and [that] she looked drunk" as he drove to the alley.

**{8}** When he got to the alley, Erickson saw a couple of houses nearby. Erickson and Child got out of the Durango—which was still running—to hug one another goodbye. Child walked around the vehicle to the driver side, hugged Erickson, and then pushed him aside and jumped into the open Durango. Child locked the doors of the Durango and drove northbound down the alley.

**{9}** Erickson chased after Child on foot, pounded on the driver side window, and yelled at Child to stop. Instead of stopping, Child continued to drive, jumped a curb, and crashed through a chain-link fence. Child paused briefly before turning the Durango around and driving back over the downed fence and toward the alley. Erickson saw Child drive southbound down the alley and heard the Durango strike a dumpster before he lost sight of the vehicle. Erickson immediately called and messaged Child through Facebook Messenger "over and over again" but she did not respond to Erickson until the following day.

**{10}** Child testified on her own behalf at the adjudicatory hearing. According to Child, there were five people at the apartment (not three as Erickson testified to), and she claimed that everyone at the apartment—including Erickson and Child—had been drinking alcohol. Child denied having smoked marijuana that evening.

**{11}** As to the ride home, Child testified that Erickson was driving erratically, that he tried to kiss her, and that she told him to pull over and let her drive because he was drunk. According to Child, Erickson eventually pulled over behind the Ashley Furniture store. Both Child and Erickson got out of the Durango, and after arguing about whether it was safe for Erickson to drive, Child told Erickson she was going to walk home. Child testified that Erickson started to follow her as she began to walk home and that she was afraid Erickson would hurt her.

**{12}** Child testified that it took her approximately twenty-eight minutes to walk home from the alley. Child's mother, Jennifer Baca, testified that Child arrived home at approximately 1:03 a.m.

**{13}** Erickson's Durango was located shortly before 2:30 a.m. by the Clovis Police Department after investigating a report about a vehicle that crashed into a fence. The vehicle was totaled.

**{14}** A jury determined that Child committed the acts of unlawful taking of a motor vehicle and reckless driving. This appeal followed. We reserve discussion of additional facts where necessary to our analysis.

## DISCUSSION

### A. The Facebook Messages Were Not Properly Authenticated

**{15}** During the adjudicatory hearing, Erickson testified that he and Child communicated on their cellphones exclusively using Facebook Messenger. Erickson further testified that, although Child did not respond to his messages after she stole his Durango, she did message him the following day. The State then provided Erickson with printouts of the messages Child reportedly sent him; however, as Erickson attempted to read the messages, Child's counsel objected, arguing a lack of foundation. In response, the State attempted to lay further foundation, and Erickson confirmed that the State's exhibits were fair and accurate accounts of the Facebook messages he and Child exchanged the day after she stole the Durango. Child's counsel responded that the evidence did not demonstrate that the messages came from Child's Facebook account and argued that laying a foundation for the admission of Facebook messages is difficult "because anybody can have access to [an individual's] phone or Facebook account." The district court overruled the objection and admitted the exhibits, after which Erickson read the Facebook messages—which contained incriminating statements—to the jury.

**{16}** On appeal, Child argues that the district court erred in admitting the Facebook messages. Specifically, Child argues (1) Erickson did not, and could not, verify that Child was in fact the author of the Facebook messages; (2) there was no evidence presented that Child sent the Facebook messages from her personal Facebook account; and (3) the Facebook messages were not capable of self-authentication.

**{17}** Rule 11-901(A) NMRA of the New Mexico Rules of Evidence addresses the authentication of evidence and requires that the proponent of an item of evidence "produce evidence sufficient to support a finding that the item is what the proponent claims it is." *Id.*; *see State v. Imperial*, 2017-NMCA-040, ¶ 28, 392 P.3d 658 ("Evidence is properly authenticated by the production of foundational evidence 'sufficient to support a finding that the item is what the proponent claims it is.' " (quoting Rule 11-901(A))). The standard for authentication is low, and "[a]s a general rule, the admission of evidence is entrusted to the discretion of the trial court, and rulings of the trial judge will not be disturbed absent a clear abuse of discretion." *State v. Trujillo*, 2002-NMSC-005, ¶ 15, 131 N.M. 709, 42 P.3d 814 (alteration, internal quotation marks, and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Maples*, 2013-NMCA-052, ¶ 13, 300 P.3d 749 (internal quotation marks and citation omitted). "We will not presume that the district court abused its discretion, but will instead presume the rectitude and regularity of the proceedings[.]" *Salehpoor v. N.M. Inst. of Mining & Tech.*, 2019-NMCA-046, ¶ 26, 447 P.3d 1169 (internal quotation marks and citations omitted).

**{18}** Rule 11-901(B) illustrates several ways to authenticate evidence, including through testimony of a witness with knowledge, distinctive characteristics of the item of evidence, and other evidence about a process or system. Depending on the type of evidence offered, a combination of these approaches may be required to authenticate the evidence. *Compare State v. Jackson*, 2018-NMCA-066, ¶¶ 15-16, 21, 429 P.3d 674 (affirming admission of text messages where the prosecution's expert in digital analysis and digital forensic analysis testified as to his examination of the defendant's alleged cell phones and a civilian witness testified that she knew she was corresponding with the defendant because she recognized his voice when she called the number and the text messages were consistent with the defendant's in-person responses), *with State v. Thurman*, 1972-NMSC-040, ¶ 9, 84 N.M. 5, 498 P.2d 697 (holding that the officer's testimony that the video tape was a true and accurate depiction as to what it purported to represent was sufficient for authentication).

**{19}** In this case, the evidence at issue are messages exchanged through Facebook, a social media website. Various forms of evidence from Facebook have been used in trials ranging in form from profile pages, photos or videos, written postings, or—as in this case—private messages. *See, e.g.*, *Commw. v. Fielding*, 119 N.E.3d 328, 332 (Mass. App. Ct. 2019) (addressing authentication of Facebook photo); *Mack v. State*, 832 S.E.2d 415, 416-17 (Ga. 2019) (discussing admission of third-party comment on the defendant's Facebook page); *United States v. Vayner*, 769 F.3d 125, 131-32 (2d Cir. 2014) (reviewing admission of printout of the defendant's profile page on Russian social media website).

**{20}** "Creating a Facebook account is easy. . . . [A]nyone at least thirteen years old with a valid e[-]mail address [can] create a profile." 2 Kenneth S. Broun et al., *McCormick on Evidence* § 227 (8th ed. 2020) (omission in original) (internal quotation marks and citation omitted). To create a Facebook profile, all one has to do is "go to www.facebook.com, enter his or her full name, birth date, and e-mail address, and register a password. Facebook then sends a confirmation link to the registered e-mail, which the person must click on to complete registration." *Smith v. State*, 2012-CT-00218-SCT (¶ 19) (Miss. 2014). Although Facebook requires confirmation for account creation, it is possible for a person to set up an account purporting to belong to someone else. In fact it is relatively common: "By November 2019, Facebook had removed more than five billion fake accounts in 2019, up from 3.3 billion in 2018." *State v. Allcock*, 2020 VT 60, ¶ 18, 237 A.3d 648. In 2020, the number of fake accounts removed by the company jumped to 5.8 billion. *See* Community Standards Enforcement Report, Facebook Transparency, https://transparency.facebook.com/community-standards-enforcement#fake-accounts.

**{21}** While it is evident that Facebook may be manipulated by individuals of even relative technological savviness, we are nevertheless confident that our rules for authentication provide an appropriate framework for determining admissibility. *Cf. Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 32, 134 N.M. 421, 77 P.3d 1014 (recognizing a trial court's gatekeeping role in the context of admitting scientific evidence); *see also State ex rel. State Highway Dep't v. Kistler-Collister Co.*, 1975-

NMSC-039, ¶ 16, 88 N.M. 221, 539 P.2d 611 ("It is true that the sufficiency of the foundation or authenticating evidence is a matter largely within the discretion of the trial court[.]"). However, given the risks discussed here, we emphasize that, as gatekeepers, courts must take care to ensure the proponent of the evidence "produce[s] evidence sufficient to support a finding that the item is what the proponent claims it is." Rule 11-901(A). In this regard, when parties seek to admit evidence of messages sent through social media websites such as Facebook, authorship is key to authentication. Therefore, the proponent must produce evidence sufficient to support a finding that both the account and the accompanying messages are linked to the purported social media user. In doing so, the proponent may use any form of verification available under Rule 11-901(B). Such evidence may be of a direct or circumstantial nature. *Cf. State v. Romero*, 2019-NMSC-007, ¶ 41, 435 P.3d 1231 (noting that the identity of a telephone caller "may be established by either direct or circumstantial evidence" (internal quotation marks and citation omitted)). With this in mind, we now turn to evaluate the admission of Facebook messages in this case.

**{22}** Once an item of evidence has been authenticated and is therefore admissible, the jury is free to make its own determination with respect to reliability. *See Vayner*, 769 F.3d at 131 ("[A]uthentication of course merely renders evidence admissible, leaving the issue of its ultimate reliability to the jury." (alterations, internal quotation marks, and citation omitted)). "Thus, after the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence—not to its *admissibility*." *Id.* (internal quotation marks and citation omitted).

**{23}** In its answer brief, the State maintains that it laid a sufficient foundation supporting the admission of the Facebook messages. First, the State argues that the presence of Child's name and photo on the printouts of the Facebook messages were sufficient to tie authorship of the messages to Child under Rule 11-901(B)(4). Second, the State argues that circumstantial evidence demonstrates that Child authored the Facebook messages because "few people would have known anything about [Erickson's] vehicle being stolen or had access to [Child]'s cell phone." We disagree.

**{24}** To begin, the mere presence of Child's name and photo, in and of itself, is not enough to suggest Child authored the Facebook messages. As we have previously explained, fake Facebook accounts abound. *See Allcock*, 2020 VT 60, ¶ 19 ("[M]isrepresenting, masquerading, and lying are common in every day social networking use." (internal quotation marks and citation omitted)). "The ease in fabricating a social media account to corroborate a story means that more than a simple name and photograph are required to sufficiently link the communication to the purported author under Rule [11-]901." *People v. Kent*, 2017 IL App (2d) 140917, ¶ 118 (internal quotation marks and citation omitted); *see also Sublet v. State*, 113 A.3d 695, 713 (Md. 2015) ("[A]nyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's

username and password." (internal quotation marks and citation omitted)). Without more, Child's name and photo do not sufficiently show, for purposes of authentication, that Child authored the Facebook messages.

**{25}** Although we conclude that Child's name and photo alone were not sufficient to authenticate the messages, because "[e]vidence may be authenticated in many ways, and as with any piece of evidence whose authenticity is in question, the type and quantum of evidence necessary to authenticate a web page will always depend on context[,]" we take no stance on what kind of evidence would have been sufficient to authenticate the Facebook messages proffered by the State. *Vayner*, 769 F.3d at 133 (internal quotation marks and citation omitted). We will, however, discuss what is absent in the record before us as a means of illustrating the various methods by which a proponent of social media messages may meet their burden of authentication under Rule 11-901(A).

**{26}** We first note that Child did not admit to sending the Facebook messages nor did anyone else testify that they saw Child send the Facebook messages. *See Sublet*, 113 A.3d at 713 (describing the "first and most obvious method for authentication" as asking the purported author if they wrote the messages). Indeed, the only information presented tying the Facebook messages to Child was Erickson's testimony. Although Erickson testified that the messages were from the Facebook account through which he and Child usually communicated, Erickson did not testify as to how he knew that the Facebook account was Child's; nor did he testify as to how he knew that Child herself authored the messages in question. *See Smith*, 2012-CT-00218-SCT (¶ 25) (rejecting the premise that testimony of a sole witness as to authorship of social media messages passes muster as satisfying Rule 11-901(A) when the movant "fail[s] to provide any information as to the basis of [the witness's] purported knowledge").

**{27}** Additionally, while business records might sufficiently establish that Child authored the messages, no such records are before us. *See Jackson*, 2018-NMCA-066, ¶¶ 14-18; *see also Smith*, 2012-CT-00218-SCT (¶ 21) (providing "information directly from the social networking website that links the profile and posting to the purported author" as another method by which a social media record or message may be authenticated).

**{28}** Turning to the State's second argument that the Facebook messages were attributable to Child because of their contents, we recognize that the Facebook messages not only reference that Child drank alcohol the evening before—as she testified to—but also allude to the fact that her drinking may have (1) impacted the status of Erickson's vehicle, and (2) warranted law enforcement's involvement. However, the circumstances described in the Facebook messages were also known by Erickson and at least two other individuals who were with him while he spoke with Officer Olivas. Given the number of individuals with knowledge of the circumstances besides Erickson and Child, we are unconvinced that the content of the messages was sufficiently confidential to establish that only Child could have authored the messages. Thus, the State's second argument also fails.

**{29}** Although authentication under Rule 11-901(A) is a low threshold and "[p]rintouts of emails, internet chat room dialogues, and cellular phone text messages have all been admitted into evidence when found to be sufficiently linked to the purported author so as to justify submission to the jury for its ultimate determination of authenticity[,]" we agree with Child that the State failed in this instance to carry its burden. *Tienda v. State*, 358 S.W.3d 633, 639 (Tex. Crim. App. 2012). Accordingly, we hold that the district court abused its discretion in admitting the Facebook messages.

## B.    The Admission of the Facebook Messages Was Not Harmless

**{30}** We next address whether the district court's admission of the Facebook messages constituted harmless error. "Improperly admitted evidence is not grounds for a new [adjudicatory hearing] unless the error is determined to be harmful." *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110. In order to determine whether a district court's erroneous application of the Rules of Evidence is harmless, "we apply the non-constitutional error standard for harmless error." *State v. Leyba*, 2012-NMSC-037, ¶ 24, 289 P.3d 1215.

**{31}** Under this standard, we assess the circumstances surrounding the error, which may include "an examination of the source of the error"; "evidence of [Child's] guilt separate from the error"; "the importance of the erroneously admitted evidence in the prosecution's case"; and "whether the error was cumulative or instead introduced new facts." *See Tollardo*, 2012-NMSC-008, ¶ 43 (alterations, internal quotation marks, and citation omitted). We also "look at the other, non-objectionable evidence of guilt, not for a sufficiency-of-the-evidence analysis, but to evaluate what role the error played at trial." *See Leyba*, 2012-NMSC-037, ¶ 24. If this analysis reveals a "reasonable probability" that the district court's erroneous admission or exclusion of evidence "contributed to the defendant's conviction[,]" then reversal is warranted. *Id.* (alteration, internal quotation marks, and citation omitted).

**{32}** The Facebook messages were introduced over Child's objection by the State in its direct examination of Erickson. The Facebook messages read in full:

> [Child]: Your car!!
>
> [Child]: I was drunk as fuck[.]
>
> [Child]: I'm so sorry.
>
> [Child]: Did u call the cops on me[?]
>
> [Erickson]: Had to.
>
> [Child]: And u gave them my name?
>
> [Erickson]: Had to. What you did was beyond fucked up.

[Erickson]: And now I'm in deep shit for it.

[Child]: I'm IN DEEP SHIT[.]

[Child]: I was completely drunk[.] I don't know what I was doing[.]

[Erickson]: Well we're both fucked.

[Child]: Yeah no kidding.

[Child]: I'm going to jail[.]

[Erickson]: I can't believe you took my car to Clovis and totaled it.

[Child]: I was drunk.

**{33}** Child was accused of committing the delinquent acts of unlawful taking of a motor vehicle and reckless driving. In order to find that Child committed the act of unlawful taking of a motor vehicle, the jury was instructed that the State must prove to its satisfaction beyond a reasonable doubt that Child took Erickson's Durango without his consent on or about February 25, 2020. *See* UJI 14-1660 NMRA. And, in order to find that Child committed reckless driving, the jury was instructed that the State must prove to its satisfaction beyond a reasonable doubt that Child operated a vehicle in a careless and heedless manner in willful or wanton disregard for the rights or safety of others so as to endanger a person or property. *See* UJI 14-4504 NMRA.

**{34}** In an effort to meet its burden of proof, the State elicited testimony from Erickson describing the events during which he stated Child took the Durango without Erickson's consent. He testified that Child pushed him aside, jumped in the Durango, and refused to stop as he chased and pounded on the driver side window and yelled at Child to stop. The State also introduced photographs of footprints located next to a set of tire tracks, a downed fence, an askew dumpster, and scuff marks on a curb, all of which tended to corroborate Erickson's description of the manner in which he claimed Child took and drove off with his Durango. However, none of the photographs showed Child in the driver's seat of the Durango. Child, on the other hand, denied having driven the Durango and instead testified that once Erickson pulled over near the Ashley Furniture store, she got out of the Durango and walked home.

**{35}** Consequently, the State's case as to each of the delinquent acts, were directly tied to Erickson's credibility and Child's lack of credibility. And although Child provided the jury with conflicting testimony regarding the use of her cell phone—initially testifying that she texted her mother while she was walking home but later testifying that she was in the Durango when she texted her mother—Child later explained that she was confused when she initially stated she texted her mother while she was walking home.

**{36}** The Facebook messages on the other hand were highly incriminating. Child not only purportedly apologized for taking the Durango to Clovis and totaling it, but also

blamed her actions on being "drunk." As the United States Supreme Court observed, "confessions have [a] profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind[.]" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks and citation omitted). Based on the record before us, we cannot say then that there is no reasonable probability that the district court's erroneous admission of the Facebook messages contributed to the jurors' determination that Child committed both delinquent acts. Accordingly, we reverse each of Child's delinquency adjudications.

## C.    Sufficient Evidence Supports Child's Adjudications

**{37}**    Although we reverse each of Child's adjudications and remand for a new adjudicatory hearing based on the erroneous admission of the Facebook messages—which we have concluded were not harmless error—we address Child's claims regarding the sufficiency of the evidence. *See State v. Post*, 1989-NMCA-090, ¶ 22, 109 N.M. 177, 783 P.2d 487 ("If all of the evidence, including the wrongfully admitted evidence, is sufficient, then retrial following appeal is not barred [by the Double Jeopardy Clause]."). Child argues that the evidence was insufficient to support her adjudications for unlawful taking of a motor vehicle and reckless driving.

**{38}**    In reviewing challenges to sufficiency of the evidence, we determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). In reviewing the sufficiency of the evidence, we consider all the evidence admitted, even wrongfully admitted evidence. *See Post*, 1989-NMCA-090, ¶ 22. We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

### 1.    Unlawful Taking of a Motor Vehicle

**{39}**    "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Smith*, 1986-NMCA-089, ¶ 7, 104 N.M. 729, 726 P.2d 883. In order to find that Child committed the act of unlawful taking of a motor vehicle, the jury was instructed that the State must prove to its satisfaction beyond a reasonable doubt that (1) Child took a white 2002 Dodge Durango without the owner's consent, and (2) this occurred on or about February 25, 2020. *See* UJI 14-1660.[3]

---

3In addition to the elements of unlawful taking of a motor vehicle and reckless driving, the jury was instructed that it had to find beyond a reasonable doubt that Child acted intentionally when she committed the act and that "[a] person acts intentionally when she purposely does an act which the law declares to be a delinquent act even though she may not know that her act is unlawful. Whether the child acted

**{40}** Child argues that only one witness—Erickson—"claimed that [she] was in possession of the [Durango]" and that the State never proved that Child had possession of the Durango by fingerprint, hair, or DNA evidence. The former argument fails since the "testimony of a single witness may legally suffice as evidence to support a jury's verdict." *State v. Riley*, 1970-NMCA-015, ¶ 6, 82 N.M. 298, 480 P.2d 693. Because Child directs us to no case law to support the latter argument that the State was required to produce physical evidence of Child's possession of the Durango, we assume no such authority exists. *See State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129.

**{41}** Viewing the evidence in the light most favorable to the delinquency verdict, we conclude that the following evidence supports the jury's determination that Child unlawfully took Erickson's Durango. Erickson testified that after getting out of the Durango to hug Child goodbye, Child pushed him aside and took off in his Durango without his permission and that she failed to stop even though he ran after her, banged on the driver side window, and yelled for her to stop. Erickson additionally testified that he filed a stolen motor vehicle report. Finally, the jury was presented with exhibits of Facebook messages Child purportedly sent to Erickson the following day in which Child apologized and claimed she was so intoxicated that she did not know what she was doing when she took the Durango and destroyed it. This evidence was sufficient to support the jurors' reasonable determination that Child committed the act of unlawful taking of a motor vehicle.

**{42}** To the extent Child argues that her mother's testimony that she "was home at 1:00 a.m., prior to the wrecked automobile being discovered" requires reversal, we disagree. Any conflict created by testimony from Child's mother regarding the time of Child's arrival at home that evening and the discovery of Erickson's crashed vehicle by the Clovis Police Department was for the jury to resolve. *See Jackson*, 2018-NMCA-066, ¶ 25 ("It is for the jury to resolve conflicts in the evidence at trial, and we resolve conflicts in the light most favorable to the verdict."). The same is true of Child's testimony that she never drove Erickson's vehicle. *See id.*

## 2. Reckless Driving

**{43}** Child also challenges the sufficiency of the evidence with respect to her adjudication for reckless driving. In asserting this argument, Child contends that the State was required to prove that "Child operated a motor vehicle on a highway and did so in a careless, inattentive or imprudent manner without due regard for the width, grade, curves, corners, traffic, weather, road conditions and all other attendant circumstances." Child is mistaken.

**{44}** In order to determine that Child committed the act of reckless driving, the jury was instructed that that the State must prove to its satisfaction beyond a reasonable doubt that (1) "[C]hild operated a motor vehicle"; (2) "[C]hild drove carelessly and

intentionally may be inferred from all of the surrounding circumstances, such as the manner in which she acts, the means used, and her conduct and any statements made by her."

heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property"; and (3) this happened in New Mexico on or about February 25, 2020. *See* UJI 14-4504.

**{45}** Erickson testified that after Child took his Durango, she continued to drive as he ran beside the vehicle banging on the driver side window shouting at her to stop. Shortly thereafter, he saw Child jump a curb, knock down a fence, turn his Durango around, drive over the fence again, and he later heard the sound of his Durango striking a dumpster before he lost sight of the vehicle.

**{46}** The State also presented evidence that the following morning, Detective Rice traveled to the alley where Child took Erickson's Durango in order to look for physical evidence and to see what the area looked like. Consistent with Erickson's testimony, Detective Rice saw an "obviously damaged" fence near a playground on the north end of the alley near a church. In addition, he observed "signs that a vehicle traveled not only northbound through the alleyway, but also southbound"; scuff marks on one of the curbs that were "consistent not with a vehicle exiting the alley but entering it again at a high rate of speed"; a dumpster in the alley that had been hit by a vehicle traveling southbound; and that dirt in the alley was sprayed in such a way as to suggest that "something that had traveled high speed going south through the alleyway."

**{47}** Based on the testimony of both Erickson and Detective Rice, a reasonable jury could infer that Child operated the Durango "carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property." Section 66-8-113(A); *see State v. Bent*, 2013-NMCA-108, ¶ 24, 328 P.3d 677 ("A reasonable inference is a conclusion arrived at by a process of reasoning. This conclusion, however, must be a rational and logical deduction from facts admitted or established by the evidence, when such facts are viewed in light of common knowledge or common experience." (omission, internal quotation marks, and citation omitted)); *see also Rojo*, 1999-NMSC-001, ¶ 19 (explaining that review by appellate courts requires "scrutiny of the evidence . . . to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction" (internal quotation marks and citation omitted)). We conclude that the evidence was sufficient to support the jurors' reasonable determination that Child committed the act of reckless driving.

## D.    Child's Right of Confrontation Was Not Violated

**{48}** Child contends the district court's denial of her motion to allow witnesses to testify without face masks violated her state and federal constitutional right to confront adverse witnesses. [4] The State responds that the face mask requirement did not

---

4In the interest of judicial economy we address Child's remaining claims related to the current pandemic.

interfere with Child's right of confrontation and that the requirement of wearing a face mask serves the significant public policy interest of limiting the spread of COVID-19.

**{49}** Both the United States and New Mexico Constitutions provide a criminal defendant the right to confront adverse witnesses. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"); N.M. Const. art. II, § 14 (same). "Under [the appellate court's] interstitial mode of constitutional analysis, we first consider whether the United States Constitution provides [Child] relief before determining whether it is necessary to address a counterpart protection under the New Mexico Constitution." *State v. Thomas*, 2016-NMSC-024, ¶ 17, 376 P.3d 184. Child's claims under the Confrontation Clause are subject to de novo review. *See State v. Massengill*, 2003-NMCA-024, ¶ 5, 133 N.M. 263, 62 P.3d 354.

**{50}** "The central purpose of the Confrontation Clause, to ensure the reliability of evidence, is served by the combined effect of physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." *Thomas*, 2016-NMSC-024, ¶ 24 (alteration, omission, internal quotation marks, and citation omitted). "Generally, the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *State v. Smith*, 2013-NMCA-081, ¶ 5, 308 P.3d 135 (internal quotation marks and citation omitted). However, the right to confront an adverse witness face-to-face is not absolute: "[A child's] right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Thomas*, 2016-NMSC-024, ¶ 24 (quoting *Maryland v. Craig*, 497 U.S. 836, 850 (1990)).

**{51}** "COVID-19 is a rapidly evolving public health crisis of an extraordinary magnitude."[5] *State v. Alejandro M.*, 2021-NMCA-013, ¶ 8, 485 P.3d 787. Governor Michelle Lujan-Grisham declared the transmission of COVID-19 a public health emergency in New Mexico on March 11, 2020. *Id.* Since that time, COVID-19 has claimed the lives of more than three thousand five hundred New Mexicans. *See* N.M. Dep't of Health, *New Mexico COVID-19 Update: 411 New Cases, Totaling 181,739* (Feb. 18, 2021), https://cv.nmhealth.org/2021/02/18/new-mexico-covid-19-update-411-new-cases-totaling-181739/. As evidenced by the number of executive and judicial orders concerning access to courts, quarantine and travel restrictions, as well as social interactions, generally, there is no question that preventing the transmission of COVID-19 is an important public policy matter.

---

[5]"COVID-19 is a highly infectious and fast-spreading disease caused by a new form of coronavirus that was identified in late 2019. The official name of this novel coronavirus is SARS-CoV-2[.]" New Mexico Dep't of Health, *Policies for the Prevention and* Control *of COVID-19 in New Mexico*, 2 (Jan. 4, 2021), https://cv.nmhealth.org/wp-content/uploads/2021/01/EPI-COVID19-Containment-Policies.1.4.21.pdf. COVID-19 is generally believed to be spread "[t]hrough respiratory droplets produced when an infected person coughs, sneezes, or talks." *Id.*

**{52}**    As to the assurance of reliable testimony, the district court's ruling that witnesses wear face masks while testifying—as mandated by the Supreme Court COVID-19 Order—"ensured the presence of other confrontation elements concerning the witness testimony including administration of the oath, the opportunity for cross-examination, and the allowance for observation of witness demeanor by the trier of fact." *Thomas*, 2016-NMSC-024, ¶ 29. Witnesses were under oath as they testified in the courtroom at the adjudicatory hearing, and Child had the opportunity to cross-examine the witnesses. As for observation of demeanor, face masks "only obfuscate two witness traits— movement of the nose and mouth." *United States v. James*, No. CR-19-08019-001-PCT-DLR, 2020 WL 6081501, order at *2 (D. Ariz. Oct. 15, 2020) (non-precedential). "The Confrontation Clause does not require that the jury be able to see a witness's entire face or body." *Id.*

**{53}**    We are further persuaded that the face mask requirement did not interfere with Child's constitutional rights based on the reasoning in *United States v. Crittenden*, which explained,

> Demeanor includes the language of the entire body. . . . [T]he jurors . . . [were] able to see how the witnesses move[d] when they answer[ed] a question; [if] the witnesses hesitate[d]; how fast the witnesses [spoke]. They [saw if] the witnesses blink[ed] or roll[ed] their eyes, ma[de] furtive glances, and tilt[ed] their heads. The Confrontation Clause does not guarantee the right to see the witness's lips move or nose sniff, any more than it requires the jurors to subject the back of a witness's neck to a magnifying glass to see if the hair raised during [a] particularly probative question[].

No. 4:20-CR-7 (CDL), 2020 WL 4917733, order at *7 (M.D. Ga. Aug. 21, 2020) (non-precedential).

**{54}**    To the extent that Child argues that witnesses' demeanors were not known to the jury because of the presence of face masks, we disagree. Child spares no ink detailing the importance of facial expressions to the determination of veracity. Although we are mindful of the science supporting Child's argument, we note that she herself details the other ways in which witnesses communicate to jurors by explaining that, in addition to facial expressions, "body language and delays in speech are critically important in telling whether a witness is lying, hiding information, guarding a secret or being truthful." The jurors were able to physically see the witnesses' body language, albeit not the lower portion of their faces, as well as hear them. We cannot find any evidence in the record that would suggest that the judge, attorneys, or the jury were unable to sufficiently understand the witnesses' testimony despite their face masks.

**{55}**    Alternatively, Child requested that the witnesses wear face shields as opposed to face masks. Just as it did with Child's prior request, the district court correctly explained that Child's alternate request for face shields failed to satisfy the Supreme Court COVID-19 Order and denied the motion. *See* Supreme Court Order No. 20-8500-17

(May 15, 2020), https://www.nmcourts.gov/wp-content/uploads/2020/12/Order-No_-20-8500-017-Requiring-Use-of-Face-Masks-in-NM-Courts-During-COVID-19-PHE.pdf.

**{56}**    "The [c]ourt is responsible for the safety of everyone in the courtroom[.]" *James*, 2020 WL 6081501, at *1. Our Supreme Court's COVID-19 operating procedures have been designed, in conjunction with the New Mexico Department of Health, based on the best available science and with public safety in mind. *See, e.g.*, Administrative Office of the Courts, *People entering New Mexico courthouses required to wear a face covering* (May 15, 2020), https://www.nmcourts.gov/wp-content/uploads/2020/12/News-release-People-entering-a-NM-courthouse-must-wear-a-face-covering.pdf (quoting Chief Justice Judith K. Nakamura as stating, "State health officials have made it abundantly clear that if each of us wears a mask in public we can help slow the spread of COVID-19 and save lives[.] . . . Our courts provide essential services to the public so we continue to take all steps necessary to safeguard the health and well-being of people who work in or need to visit a courthouse." (internal quotation marks omitted)).

**{57}**    According to the Centers for Disease Control and Prevention (CDC), "face shields are not as effective as masks, and it does not recommend substituting face shields for masks." *Crittenden*, 2020 WL 4917733, at *6. A face shield primarily serves to protect the eyes of the individual wearing it, but does little to prevent the spread of respiratory droplets to others as a face shield leaves large gaps below and along the face. *See* Centers for Disease Control and Prevention, *Guidance for Wearing Masks: Help Slow the Spread of COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html. On the other hand, a face mask over the mouth and nose prevents an individual's respiratory droplets from reaching others. *Id.* Because COVID-19 is primarily spread through respiratory droplets, the face mask requirement "mitigates for all trial participants the risk of transmission of a potentially deadly or disabling virus." *James*, 2020 WL 6081501, at *1.

**{58}**    Bearing in mind the unique attendant circumstances to the COVID-19 pandemic, Child's constitutional right to confrontation was not violated by the requirement that witnesses wear face masks at her adjudicatory hearing.

**E.    The District Court Did Not Abuse Its Discretion by Denying Child's Motion to Continue**

**{59}**    Child next argues that the district court abused its discretion when it denied her request to continue the trial "as a remedy to the face mask issue and [C]onfrontation [Clause issue]." We disagree.

**{60}**    " 'An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say [a] trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason.' " *State v. Salazar*, 2007-NMSC-004, ¶ 10, 141 N.M. 148, 152 P.3d 135 (quoting *Rojo*, 1999-NMSC-001, ¶ 41). In evaluating a motion for a continuance, trial courts consider "the length of the requested delay, the likelihood that a delay would

accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the prejudice to the movant in denying the motion." *State v. Torres*, 1999-NMSC-010, ¶ 10, 127 N.M. 20, 976 P.2d 20. We will not find an abuse of discretion when reasons in the record "both support and detract from a trial court's decision." *State v. Anthony L.*, 2019-NMCA-003, ¶ 7, 433 P.3d 347. Our review involves "look[ing] at the evidence and its inference[s] in the light most favorable to the district court's decision." *Id.*

**{61}** Child alternatively requested that her adjudicatory hearing be continued until such time as our Supreme Court's COVID-19 operating procedures are relaxed to the point at which witnesses may testify without face masks. Child's continuance request was one of an indefinite length since "COVID-19 is unprecedented as much as it is unpredictable. . . . [T]here is no way for the [c]ourt to know when the crisis will end." *United States v. Casher*, No. CR 19-65-BLG, 2020 WL 3270541, order at *3 (D. Mont. June 17, 2020) (non-precedential); *cf. Quinn v. City of Tuskegee*, 464 F. Supp. 3d 1262, 1263 (M.D. Ala. 2020) (order) ("Jury trials cannot remain stalled indefinitely[.]").

**{62}** No vaccines were available to combat COVID-19 at the time of Child's adjudicatory hearing. *See S. Bay Pentecostal Church v. Newsom*, ___ U.S. ___, ___, 140 S. Ct. 1613, 1613 (2020) (Roberts, C. J., concurring) ("At this time, there is no known cure, no effective treatment, and no vaccine."). And while two vaccines have since been developed and approved, widespread inoculation remains elusive. *See Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, No. TDC-20-1320, 2020 WL 7240396, mem. op. at *3 (D. Md. Dec. 9, 2020) (non-precedential) (explaining that widespread administration of COVID-19 vaccines will not occur until spring 2021). An indefinite continuance would have achieved Child's desired outcome—that is, for witnesses to testify at her adjudicatory hearing without face masks—but it is impossible to predict when the New Mexico Supreme Court's operating procedures will allow for such.

**{63}** As for previous continuances, the State filed the only other continuance request in this case, which the district court granted. Therefore, this factor weighs in favor of Child.

**{64}** Because Child is not at fault for the reason underlying her continuance request—that is, the desire to have an adjudicatory hearing as it may have taken place prior to COVID-19—we weigh this factor neutrally. *See Oglesby v. Masse Contracting, Inc.*, No. 19-2360-WBV-JCW, 2020 WL 3063849, order at *1 (E.D. La. June 9, 2020) (non-precedential) ("The [c]ourt acknowledges and understands interruptions associated with the pandemic that has affected the [s]tate, the country and the world.").

**{65}** The timing of Child's request does, however, weigh against her. Child requested to continue her adjudicatory hearing on the morning it was set to take place. As the State correctly points out, the face mask requirement went into effect on May 15, 2020,

which left Child ample time to request a continuance prior to June 15, 2020—the morning of her adjudicatory hearing. "[W]e presume resetting the trial date on the day trial is supposed to begin is inconvenient for the parties and for the court." *State v. Gonzales*, 2017-NMCA-080, ¶ 36, 406 P.3d 534. This is especially true in the context of COVID-19 when the district court had to take additional measures, consistent with our Supreme Court's operating procedures, to ensure the safety of the adjudicatory hearing participants. *See, e.g.*, *State v. Brazeal*, 1990-NMCA-010, ¶ 16, 109 N.M. 752, 790 P.2d 1033 ("Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons." (internal quotation marks and citation omitted)).

**{66}** Finally, it is Child's responsibility to "establish not only an abuse of discretion, but also that the abuse was to [her injury]." *Salazar*, 2007-NMSC-004, ¶ 10 (internal quotation marks and citation omitted). "No more prejudice need be shown than that the trial court's order may have made a potential avenue of defense unavailable to the defendant." *Id.* ¶ 16 (internal quotation marks and citation omitted). As we have already explained, just because Child argues that face masks denied her "the ability to fully confront her accusers" does not make it so. Child has not met her burden of showing—at the bare minimum—that the district court's ruling prejudiced her by eliminating a potential defense.

**{67}** In conclusion, the district court's decision to deny Child's continuance request was reasonable and supported by the circumstances at hand. *See State v. Le Mier*, 2017-NMSC-017, ¶ 18, 394 P.3d 959 ("[T]rial courts shoulder the significant and important responsibility of ensuring the efficient administration of justice in the matters over which they preside, and it is our obligation [as appellate courts] to support them in fulfilling this responsibility.").

**CONCLUSION**

**{68}** Based on foregoing, we reverse Child's delinquency adjudications and remand for a new adjudicatory hearing consistent with this opinion.

**{69}** **IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**SHAMMARA H. HENDERSON, Judge**