The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 16, 2022

**NO. S-1-SC-38769**

**STATE OF NEW MEXICO,**

Plaintiff-Petitioner,

v.

**JESENYA O.,**

Child-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Donna J. Mowrer, District Judge**

Hector H. Balderas, Attorney General
Benjamin L. Lammons, Assistant Attorney General
Santa Fe, NM

for Petitioner

Liane E. Kerr, LLC
Liane E. Kerr
Albuquerque, NM

for Respondent

**OPINION**

**ZAMORA, Justice.**

{1}	This appeal calls upon us to consider issues relating to the authentication of social media evidence. Specifically, we are asked to review a determination by the Court of Appeals that the district court abused its discretion in authenticating screenshots of Facebook Messenger messages allegedly initiated by Jesenya O. (Child) in the near aftermath of the events giving rise to the underlying delinquency proceeding. *State v. Jesenya O.*, 2021-NMCA-030, ¶ 29, 493 P.3d 418. As part of this inquiry, we consider as a matter of first impression whether admissibility of such evidence should be governed by the traditional authentication standard set out in Rule 11-901 NMRA or by a heightened standard that seeks to account for the possibility that communications issued on social media platforms may be especially susceptible to fraud or impersonation.

{2}	We agree with the Court of Appeals that the traditional authentication standard set out in Rule 11-901 provides the appropriate legal framework for authenticating social media evidence. *Jesenya O.*, 2021-NMCA-030, ¶ 21. But we disagree with the conclusion reached by the Court of Appeals that the State failed to meet the threshold for authentication established under that rule, much less that the district court abused its discretion in finding the State had met its burden. *Id.* ¶ 29.

We hold the State's authentication showing was sufficient under Rule 11-901 to support a finding that, more likely than not, the Facebook Messenger account used to send the messages belonged to Child and that Child was the author of the messages. Accordingly, we reverse the Court of Appeals and reinstate Child's delinquency adjudications.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

{3}      Child, then age seventeen, became Facebook friends with a former schoolmate, Jeremiah Erickson (Erickson), then age nineteen. Over the next several weeks, the two conversed primarily, if not exclusively, through their respective Facebook[1] Messenger accounts. Facebook Messenger is an instant messaging service which allows users to communicate with one another from within Facebook or via a stand-alone application. *See Messenger From Meta*, https://about.facebook.com/technologies/messenger/ (last visited June 1, 2022). Facebook users may access the application from a variety of devices, including desktop computers, mobile phones, and tablets. *Id.* On two occasions, Child and

---

[1]Facebook changed its company brand to "Meta" in 2021. *See Introducing Meta: A Social Technology Company*, https://about.fb.com/news/2021/10/facebook-company-is-now-meta/ (last visited June 1, 2022). Throughout this opinion, we refer to the company name in use when the messages at issue were allegedly sent, i.e., Facebook.

Erickson used Facebook Messenger to arrange in-person meetings, during which Erickson drove to Child's house to pick her up and drive her somewhere to "hang out."

{4} It was the second of these meetings that gave rise to the events leading to Child's adjudication. Both Erickson and Child testified to the jury that their get-together on the night of February 24, 2020, did not end well, although each provided a different narrative as to what unfolded. According to Erickson, Child had acted "weird" at the get-together and appeared to be high or drunk. He testified that, while he was driving Child home, she asked him to park his vehicle near a home located on an alley behind a furniture store, which he did, leaving the engine running and the driver's side door open. According to Erickson, after the two exited the car to say good night, Child pushed him out of the way, assumed control of the vehicle, and drove off by herself, crashing through a chain-link fence, striking a dumpster, and driving the car out of Erickson's sight.

{5} Child's testimony painted a different picture. According to Child, Erickson was drunk and driving recklessly on the way to her home. She testified that he made advances toward her and that he stopped the car in the alley after she rejected them. According to Child, both parties exited the vehicle, Child asked if she could drive the vehicle, Erickson refused, and Child then told Erickson she would not get back

in the car with him. Child began to walk down the alley with Erickson following her. Child testified she ran away from Erickson in fear and walked the rest of the way home alone. On cross-examination, Child claimed she did not have her phone with her after leaving Erickson's vehicle.

{6}    At Child's adjudication, the State sought to introduce evidence of communications between Child and Erickson the State alleged took place on Facebook Messenger the day after the incident involving Erickson's vehicle. The evidence was proffered in the form of two screenshots (hereinafter "the February 25 messages") showing communications between a user identified as Erickson and a user identified by name and photograph as Child. The messages reflected the following exchange:

[Child]: Your car!!

[Child]: I was drunk as fuck

[Child]: I'm so sorry.

[Child]: Did u call the cops on me

[Erickson]: Had to.

[Child]: And u gave them my name?

[Erickson]: Had to. What you did was beyond fucked up.

[Erickson]: And now I'm in deep shit for it.

4

[Child]: I'm IN DEEP SHIT

[Child]: I was completely drunk I don't know what I was doing

[Erickson]: Well we're both fucked.

[Child]: Yeah no kidding.

[Child]: I'm going to jail

[Erickson]: I can't believe you took my car to Clovis and totaled it.

[Child]: I was drunk.

{7}     The State sought to authenticate the February 25 messages through Erickson's testimony as to his personal knowledge of both the accuracy of the screenshots and his history of Facebook Messenger communications with Child, as well as through the contents of the messages themselves. Child's trial counsel objected to the authentication of the exhibits, arguing the screenshots did not show with certainty that the messages were sent from Child's Facebook account and emphasizing what counsel characterized as the inherent difficulty in "lay[ing a] foundation on Facebook Messenger messages because anybody can have access to somebody's phone or Facebook account." The district court overruled the objection, and the evidence was admitted. Child was subsequently adjudicated delinquent and appealed the district court's judgment and disposition to the Court of Appeals.

{8} On appeal, Child challenged the foundation laid by the State for the screenshots of the February 25 messages. The Court of Appeals reversed based solely on the authentication issue. *Jesenya O.*, 2021-NMCA-030, ¶¶ 29, 36. It concluded that, while communications arising on social media platforms are subject to the same authentication requirements as other evidence subject to Rule 11-901, the State had failed in its burden to properly authenticate the messages. *Jesenya O.*, 2021-NMCA-030, ¶¶ 24-29. In so holding, the Court of Appeals focused in part on the fact that the content of the messages was not "sufficiently confidential to establish that *only* Child could have authored the messages." *Id.* ¶ 28 (emphasis added). The Court concluded the error in admitting the messages for the jury's consideration was not harmless, vacated Child's adjudications, and remanded for a new hearing. *Id.* ¶¶ 30-36, 68.

{9} We granted the State's petition for certiorari review of whether the Court of Appeals imposed the correct standard for authenticating the messages at issue and whether it applied the appropriately deferential standard of review to the district court's decision to admit the messages as evidence. We conclude that the Court of Appeals properly relied on the traditional standard under Rule 11-901 as the framework for assessing the authenticity of the February 25 messages, but that it

6

misapplied the provisions of Rule 11-901(B)(1) and (B)(4) to the facts and circumstances of this case and failed to afford proper deference to the district court.

## II.    DISCUSSION

### A.    Standard of Review

{10}    We "generally review evidentiary matters for an abuse of discretion." *State v. Montoya*, 2014-NMSC-032, ¶ 15, 333 P.3d 935. "An abuse of discretion occurs when the [evidentiary] ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the [district] court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Sanchez*, 2020-NMSC-017, ¶ 21, 476 P.3d 889 (internal quotation marks and citation omitted). In the authentication context, "there is no abuse of discretion when the evidence is shown by a preponderance of the evidence to be what it purports to be." *State v. Jimenez*, 2017-NMCA-039, ¶ 18, 392 P.3d 668 (internal quotation marks and citation omitted). However, we review de novo the threshold legal question as to the proper framework within which to analyze a particular evidentiary issue. *See State v. Carrillo*, 2017-NMSC-023, ¶ 26, 399 P.3d 367 ("[T]he threshold question of whether the trial court applied the correct evidentiary rule or standard is subject to de novo review on appeal.").

7

**B.** **The Traditional Standard Applied Under Rule 11-901 Provides the Proper Framework for Authenticating Evidence From Social Media Platforms**

{11} For evidence to be properly authenticated under Rule 11-901 there must be a showing "sufficient to support a finding that the item is what the proponent claims it is." Rule 11-901(A). "The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" may be considered in determining whether evidence has been adequately authenticated. Rule 11-901(B)(4). The foundation required to authenticate an item of evidence "goes to conditional relevancy," *State v. Arrendondo*, 2012-NMSC-013, ¶ 9, 278 P.3d 517, and triggers "a two-step procedure; the [trial] judge initially plays a limited [but important], screening role, and the jury then makes the final decision on the question of fact," ultimately determining the weight of the evidence. Edward J. Imwinkelried, *Evidentiary Foundations* § 4.01[1], at 43 (Matthew Bender 11th ed. 2020).

{12} With the increased use of social media evidence in litigation, courts nationwide have grappled with the question of whether the authenticity of evidence from social media platforms is properly measured under the traditional rules of authentication found in Federal Rule of Evidence 901 and its many state counterparts, including our own, or, instead, whether judicial concerns over the

8

increased dangers of falsehood and fraud posed by the relative anonymity of social media evidence warrant the adoption of heightened authentication standards. There are two opposing lines of authority on this issue.

{13} Among the cases widely cited as embracing a heightened standard of authentication for social media evidence is *Griffin v. State*, decided by the Maryland Court of Appeals. 19 A.3d 415 (Md. 2011). In *Griffin*, a murder prosecution, the state sought to authenticate a redacted printout of a MySpace page allegedly belonging to the defendant's girlfriend. *Id.* at 418-19. The printout included information about the user's username, location, birthdate, and a profile photo depicting a couple embracing. *Id.* at 418. It also included this post: "FREE BOOZY!!!! JUST REMEMBER SNITCHES GET STITCHES!! U KNOW WHO YOU ARE!!" *Id*. The state sought to authenticate the printouts through the testimony of the lead investigator in the case, who testified that he was able to determine that the MySpace page belonged to the defendant's girlfriend because the user's profile photograph depicted her with the defendant, the birth date matched that of the defendant's girlfriend, and the content of the message referred to the defendant, whose nickname was "Boozy." *Id*. The trial court admitted the MySpace evidence. *Id.* at 419.

{14}    The *Griffin* Court, over a two-justice dissent, concluded that the trial court "abused [its] discretion in admitting the MySpace profile [under Maryland Rule of Evidence] 5-901(b)(4)." *Griffin*, 19 A.3d at 423-24. It concluded that the display of the girlfriend's picture, "coupled with her birth date and location, were not sufficient[ly] 'distinctive characteristics' on a MySpace profile to authenticate its printout, given the prospect that someone other than [the defendant's girlfriend] could have not only created the site, but also posted the 'snitches get stitches' comment." *Id.* In so holding, the Court declined to endorse the traditional authentication approach and instead applied heightened scrutiny to social media

evidence "because of the heightened possibility for manipulation by other than the true user or poster." *Id.* at 424.[2]

{15} The *Griffin* Court acknowledged that its holding did not mean "that printouts from social networking [web]sites should never be admitted." *Griffin*, 19 A.3d at 427. The Court suggested the party proffering the evidence would be well advised to (1) "ask the purported creator if she indeed created the profile and also if she added the posting in question," (2) "search the computer of the person who allegedly created the profile and posting and examine the computer's internet history and hard

---

[2]The Maryland Court of Appeals (consolidating three cases to address authentication of social media) has since endorsed the traditional approach. *Sublet v. State*, 113 A.3d 695 (Md. 2015). While not formally overruling *Griffin*, the *Sublet* Court adopted the reasoning of the Second Circuit in *United States v. Vayner*, 769 F.3d 125 (2d. Cir. 2014) and held that, "in order to authenticate evidence derived from a social networking website, the trial judge must determine that there is proof from which a reasonable juror could find that the evidence is what the proponent claims it to be." *Sublet*, 113 A.3d at 698. Once this threshold showing has been made, the evidence is admissible, and it is the fact-finder who determines whether the evidence is reliable and, ultimately, authentic. *See Sublet*, 113 A.3d at 715-16 (stating that authentication of evidence "merely renders [it] admissible, leaving the issue of its ultimate reliability to the jury."). Nevertheless, *Griffin* remains "one of the key cases" in the development of this area of the law, cited for the proposition that social media evidence should be subjected to a heightened degree of scrutiny for authentication purposes. *See* 2 Robert P. Mosteller et al., *McCormick on Evidence* § 227, at 108-09 & n.25 (8th ed. 2020); *see also State v. Hannah*, 151 A.3d 99, 104-05 (N.J. Super. Ct. App. Div. 2016) (describing the "Maryland approach" as "requir[ing] greater scrutiny than letters and other paper records" (internal quotation marks and citation omitted)).

drive to determine whether that computer was used to originate the social networking profile and posting in question," or (3) "obtain information directly from the social networking website that links the establishment of the profile to the person who allegedly created it and also links the posting sought to be introduced to the person who initiated it." *Id.* at 427-28.

{16} While many courts have expressed similar concerns about fraudulent authorship of social media communications, few have adopted the heightened requirements for a prima facie showing announced in *Griffin*. Instead, they have endorsed the view that the traditional authentication standard is adequate to the task of vetting social media evidence. *See generally Tienda v. State*, 358 S.W.3d 633, 638-642 (Tex. Crim. App. 2012) ("Courts and legal commentators have reached a virtual consensus that, although [electronic media present] new . . . issues with respect to . . . admissibility . . . , the rules of evidence already in place for determining authenticity are at least generally adequate to the task." (internal quotation marks and citation omitted)).

{17} The traditional authentication approach is reflected in *Tienda*, *id.*, an oft-cited case from the Texas Court of Criminal Appeals. In *Tienda*, the defendant challenged the admission into evidence of several MySpace pages that tended to implicate him in a gang-related murder, including posts, photos, and instant messages. *Id.* at 634-

37. The state relied primarily upon testimony by the victim's sister to authenticate the posts, which she found by searching MySpace. *Id.* at 635. The defendant objected, arguing that MySpace accounts could easily be created or accessed by someone other than the purported author. *Id.* at 636. The trial court admitted the evidence, and the Texas Court of Criminal Appeals affirmed. *Id.* at 637. Though acknowledging "the provenance" of social media evidence "can sometimes be open to question—computers can be hacked, protected passwords can be compromised, and cell phones can be purloined," *id.* at 641, the *Tienda* Court determined that "the internal content of the MySpace postings—photographs, comments, and music— was sufficient circumstantial evidence to establish a prima facie case such that a reasonable juror could have found that they were created and maintained by the [defendant]." *Id.* at 642. In so holding, the *Tienda* Court made clear that the state, as the proponent of the evidence, was not required to remove all doubt over the posts' provenance; this was a question for the jury to decide. *Id.* at 645-46 (recognizing that the "possibility that the [defendant] was the victim of some elaborate and ongoing conspiracy" to impersonate him on social media was a scenario for the jury to assess once the state had made a prima facie showing of authenticity).

{18}     Today we clarify that, in New Mexico, the authentication of social media evidence is governed by the traditional authentication standard set out in Rule 11-

13

901, which requires the proponent to offer "evidence sufficient to support a finding that the [evidence] is what the proponent claims it is." *See State v. Imperial*, 2017-NMCA-040, ¶ 28, 392 P.3d 658 (quoting Rule 11-901(A)). We reiterate that, in meeting this threshold, the proponent need not demonstrate authorship of the evidence conclusively; arguments contesting authorship go to the weight of the evidence, not its admissibility. *See State v. Jackson*, 2018-NMCA-066, ¶ 19, 429 P.3d 674 (holding that the fact that text messages could have been authored or received by someone other than the defendant did "not negate the admissibility of the text messages, but rather present[ed] an alternative to the State's suggested inferences," which would be for the jury to assess).

{19}     Two considerations inform our decision. First, we agree with courts in other jurisdictions that the authentication challenges arising from the use of social media evidence in litigation are not so different in kind or severity from the challenges courts routinely face in authenticating conventional writings. As one court persuasively put it in analogous circumstances,

> Rule 901 . . . does not care what form the writing takes, be it a letter, a telegram, a postcard, a fax, an email, a text, graffiti, a billboard, or a Facebook message. All that matters is whether it can be authenticated, for the rule was put in place to deter fraud. The vulnerability of the written word to fraud did not begin with the arrival of the internet, for history has shown a quill pen can forge as easily as a keystroke, letterhead stationery can be stolen or manipulated, documents can be tricked up, and telegrams can be sent by posers.

14

*State v. Green*, 830 S.E.2d 711, 714-15 (S.C. Ct. App. 2019) (citation omitted), *aff'd as modified*, 851 S.E.2d 440 (S.C. 2020). We are not convinced that the authentication of messages passed between Facebook users poses unique obstacles when compared to the authentication of evidence from other electronic sources, such as text messages sent between mobile devices. *See Jackson*, 2018-NMCA-066, ¶¶ 17-18 (concluding that the state's circumstantial evidence regarding the activity of two phone numbers was sufficient to authenticate an exhibit with information regarding the phone numbers).

{20} Second, the application of more demanding authentication requirements in the social media realm—such as those propounded in *Griffin* involving testimony from the purported author of social media postings, as well as evidence gathered from the user's computer or the social media network itself—would too often keep from the fact-finder reliable evidence based on an artificially narrow subset of authentication factors. *See* Brendan W. Hogan, *Griffin v. State: Setting the Bar Too High for Authenticating Social Media Evidence*, 71 Md. L. Rev. Endnotes 61, 85-86 (2012) (observing that the authentication methods outlined in *Griffin* "are unnecessarily specific and fail to discuss other traditional methods of authentication"). Cabining a district court's authentication analysis in this way would ultimately serve to hinder the truth-seeking process, with no discernible benefit. *See generally State v. Trujillo*,

2002-NMSC-005, ¶ 16, 131 N.M. 709, 42 P.3d 814 (discouraging a reading of our rules of evidence that "would deprive the jury of reliable . . . evidence relevant to the jury's truth-seeking role"). We decline to impose additional authentication requirements for evidence that may be adequately vetted using the gatekeeping tools already at hand.

{21} Having determined that the traditional authentication standard arising under Rule 11-901 provides the appropriate framework for evaluating the authenticity of the February 25 messages, we next turn to the question of whether the Court of Appeals properly applied that framework in determining whether the district court abused its discretion in admitting the State's exhibits.

**C. The Court of Appeals Erred in Concluding That the District Court Abused Its Discretion in Admitting Evidence of the February 25 Messages**

{22} In reviewing Child's claim that the district court abused its discretion in admitting the February 25 messages, the Court of Appeals correctly held that "our rules for authentication provide an appropriate framework for determining admissibility." *Jesenya O.*, 2021-NMCA-030, ¶ 21. However, the Court then applied an unduly exacting standard in concluding that, because Child denied sending the messages, the State failed to proffer business records connecting the messages to Child, and the communications themselves failed "to establish that only Child could

16

have authored [them]," "the district court abused its discretion in admitting the [evidence]." *Id.* ¶¶ 26-29.

{23} "Rule 11-901(B) provides a non-exhaustive list of examples of evidence that satisfy the authentication requirement." *Salehpoor v. N.M. Inst. of Mining and Tech.*, 2019-NMCA-046, ¶ 27, 447 P.3d 1169. For instance, evidence may be authenticated by a witness with knowledge "that an item is what it is claimed to be." Rule 11-901(B)(1). The authentication of evidence may also be "based on distinctive characteristics [such as] appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." *Salehpoor*, 2019-NMCA-046, ¶ 27 (internal quotation marks and citation omitted).

{24} Here, the State proffered several indicia of Child's authorship of the disputed messages, including the presence of Child's name and profile photo on the exchanges, testimony from Erickson, the person who received the messages, and strong contextual clues as to authorship revealed in their content. This evidence was sufficient to support the district court's finding that a reasonable juror could determine that Child authored the messages and that the exhibits displaying the messages were what the State claimed them to be. *See* Rule 11-901(A) (providing that the authentication requirement is satisfied if the proponent "produce[s] evidence sufficient to support a finding that the item is what the proponent claims it is").

{25}     We start by acknowledging that the presence of what appear to be Child's name and photo on the February 25 messages was, standing alone, insufficient to establish that the messages were issued by Child or from her account. *See State v. Acosta*, 489 P.3d 608, 625 (Or. Ct. App. 2021), *appeal dismissed and opinion vacated on other grounds,* 504 P.3d 1178, (Or. 2022) (concluding that the appearance of Facebook messages that seemingly were sent from "an account that bore [the] defendant's name and included pictures that matched [the] defendant's physical appearance," were "not dispositive" of the issue of authentication). However, evidence of the appearance of social media messages, including usernames and profile pictures, may be probative circumstantial evidence of authentication when considered in conjunction with additional factors of relevance. *See id.* at 625-26 (identifying "[a] Facebook account matching [the] defendant's name and profile picture" as one of several factors that could prompt a reasonable person to conclude that "it was [the] defendant and not one of [his cohorts] who was sending messages from the [defendant's] profile"); *Parker v. State*, 85 A.3d 682, 688 n.43 (Del. 2014) (noting that a photo and profile name appearing on the printout of a Facebook page "are certainly factors that [a] trial court may consider" in its authentication analysis).

18

{26}     Here, the State provided additional foundational support through Erickson's undisputed testimony that he and Child had relied heavily, if not exclusively, on the Facebook Messenger platform in conversing with each other during the weeks leading up to the incident at issue here. As an active participant in those earlier Facebook message exchanges, as well as the critical February 25 message exchange, Erickson was clearly "a witness with knowledge" of the Facebook messages within the meaning of Rule 11-901(B)(1). As such, he was well positioned to provide direct testimony that the State's exhibits accurately depicted the screenshots of the messages he received not long after the incident. *See Kays v. Commonwealth*, 505 S.W.3d 260, 269 (Ky. Ct. App. 2016) (upholding the authentication of Facebook messages attributed to the defendant where each message was introduced through and identified by the person who sent or received it and "each one [was] *linked* to the witness introducing it by personal knowledge").

{27}     Not only did Erickson provide unchallenged testimony concerning his prior course of dealing and history of communication on Facebook with Child, he also testified that he continued to follow postings made by Child on the same Facebook account in the months between the car incident and the adjudicatory hearing. Thus, Erickson's testimony tended to establish that it was Child—and not someone posing as Child—who communicated with Erickson in the February 25 messages. To the

19

extent that Child suggested in her testimony that someone else may have had access to her phone and authored the messages at issue, this was an assertion to be weighed by the jury in its consideration of the evidence and not a bar to its admissibility. *See Jackson*, 2018-NMCA-066, ¶ 19 (holding that the fact that text messages could have been authored or received by someone other than the defendant did "not negate the admissibility of the text messages, but rather present[ed] an alternative to the State's suggested inferences," which would be for the jury to assess).

{28} Finally, the content and substance of the February 25 messages evince "distinctive characteristics" offering foundational support for their authenticity. *See* Rule 11-901(B)(4) (including "distinctive characteristics" among examples of what will satisfy the authentication requirement). As we have said, a proponent of evidence need not demonstrate authorship conclusively to satisfy the authentication requirement; to require otherwise would be to impose a heightened standard of admissibility on this type of evidence. *See State v. Candelaria*, 2019-NMCA-032, ¶ 55, 446 P.3d 1205 (concluding that evidence was admissible because it was "sufficient to permit a reasonable jury to believe" that it was what it purported to be and stating that arguments weighing against authenticity "went to the weight of the evidence, not its admissibility"). In keeping with this principle, courts and commentators widely agree that for a writing, digital or otherwise, to be sufficiently

20

distinctive for authentication purposes, "[t]he knowledge [of its contents] need not be uniquely held by the purported signer [or sender], but the smaller the group of persons with such knowledge, the stronger the desired inference of authorship." 2 Robert P. Mosteller et al., *McCormick on Evidence* § 224, at 93 (8th ed. 2020). Thus, social media communications whose contents are known or knowable by only a handful of persons are routinely recognized as qualifying for authentication on the basis of their distinctive characteristics. *See, e.g.*, *Sublet v. State*, 113 A.3d 695, 720-21 (Md. 2015) (upholding the authentication of Twitter messages that "referenced a plan" for retaliation "that had . . . been created in response to events occurring that same day" and was known by "only a small pool of [seven] individuals," including the defendant); *see also Acosta*, 489 P.3d at 625 (concluding that the trial court erred in excluding Facebook messages that "included substance that was uniquely associated with [the] defendant" or only a very small group of people who were using the account at the time).

{29} The exclusive focus of the messages at issue here was the car incident of the previous night, with the person using Child's profile initiating the discussion by expressing remorse for actions that night and asking Erickson whether he had reported the incident to the police. Given the short amount of time between the incident and the Facebook Messenger exchange, a reasonable juror could have

determined that the number of parties in possession of the information revealed in the communications was very small.

{30} The Court of Appeals concluded that the State's circumstantial evidence of authenticity was inadequate, in part because the content of the messages was not "sufficiently confidential to establish that *only* Child could have authored the messages." *Jesenya O.*, 2021-NMCA-030, ¶ 28 (emphasis added). This test applied by the Court of Appeals is at odds with the flexible approach that the authentication process envisions, under which the genuineness of a particular document—whether conventional or digital—is assessed through reliance on reasonable inferences, not absolute certainty. *See Jackson*, 2018-NMCA-066, ¶¶ 17-19 (concluding that the state's circumstantial evidence regarding the activity of two phone numbers was sufficient to authenticate an exhibit with information regarding the phone numbers); *see also State v. Smith*, 181 A.3d 118, 136 (Conn. App. Ct. 2018) (rejecting the view that "the state bore the insurmountable burden of ruling out any possibility that the [Facebook] message was not sent by the defendant"); *Acosta*, 489 P.3d at 625-26 ("Even if it were *possible* that someone else sent the messages from the profile matching [the] defendant's name and picture, the evidence was sufficient for a reasonable person to be satisfied that it was, in fact, [the] defendant who sent them."); *cf. State v. Romero*, 2019-NMSC-007, ¶¶ 41-44, 435 P.3d 1231 (concluding

that the "totality of the circumstances" surrounding a recording of an inmate's phone call was sufficient to authenticate a detective's identification of the defendant as the inmate on the call). Equally as important, such an approach fails to afford due deference to the discretion of the district court, which is charged with determining whether a preponderance of the evidence supports a finding of authenticity. *See Jimenez*, 2017-NMCA-039, ¶ 18 ("[T]here is no abuse of discretion when the evidence is shown by a preponderance of the evidence to be what it purports to be." (internal quotation marks and citation omitted)).

{31} Where, as here, a proper foundation has been established under Rule 11-901, it is for the jury to decide whether a particular person or entity was the author or recipient of a given digital communication. In this regard, we endorse the authentication procedures previously outlined by our Court of Appeals in *Jackson*, a case involving an exhibit displaying cellular text messages. 2018-NMCA-066, ¶¶ 18-19. The *Jackson* Court, faced with a defense argument that it was "possible" that persons other than the defendant authored the text messages in question, said:

> It was for the jury to decide whether [the d]efendant was the author or recipient of the text messages in the exhibit. . . . [The d]efendant's argument that the text messages in the exhibit could have been authored or received by someone else, does not negate the admissibility of the text messages, but rather presents an alternative to the State's suggested inferences.

23

*Id.* ¶ 19. As *Jackson* instructs, Child's argument, premised on the possibility that others could have sent the February 25 messages, went to the weight of the evidence, not its admissibility. *Id.* Accordingly, it was for the jury to assess that argument in determining, as an ultimate matter, whether the communications were authentic.

{32} We hold the appearance of the messages, the disputants' frequent prior Facebook Messenger communications, and the content of the messages, when taken together and viewed in combination, were sufficient to support a finding that the screenshots of those messages were, more likely than not, what they purported to be. Given the highly deferential nature of abuse of discretion review, there was no cause to disturb the ruling made by the district court.

**III.    CONCLUSION**

{33} Because we hold the district court reasonably could find that the State met its low threshold of proof in establishing prima facie the authenticity of the February 25 messages, we reverse the Court of Appeals' determination on that issue and reinstate Child's delinquency adjudications.

{34}    **IT IS SO ORDERED.**

_____

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

_____

**C. SHANNON BACON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**

_____

**DAVID K. THOMSON, Justice**

_____

**JULIE J. VARGAS, Justice**