NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Belknap
Nos. 2019-0314
       2021-0314


THE STATE OF NEW HAMPSHIRE

v.

KEITH CHANDLER

Argued: October 18, 2022
Opinion Issued: October 25, 2023
Opinion Modified: November 21, 2023

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Sam M. Gonyea, attorney, on the brief, and Audriana Mekula, attorney, orally), for the State.

Thomas Barnard, senior assistant appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Keith Chandler, appeals his convictions, following a jury trial in the Superior Court (O'Neill, J.), on five counts of aggravated felonious sexual assault, RSA 632-A:2, I(1), III (2016), two counts of attempted aggravated felonious sexual assault, RSA 632-A:2, I, (j)(1) (Supp.

2022), and two counts of felonious sexual assault, RSA 632-A:3, III(a)(1) (Supp. 2022).  The defendant argues that the trial court erred when it: (1) denied his motion in limine to preclude the admission of a printed image of electronically stored information; (2) denied his motion for a new trial based upon ineffective assistance of counsel; and (3) failed to disclose records following in camera review.  We affirm in part, but remand for the trial court to review the confidential records in accordance with the standard set forth in State v. Girard, 173 N.H. 619 (2020).

The record supports the following facts.  The victim's biological parents divorced when she was young and her mother then married the defendant. The victim lived with her mother and the defendant for most of her childhood. In late 2016, the victim told her boyfriend that the defendant had sexually assaulted her, but threatened to break up with him if he told anyone.  After the victim and the boyfriend broke up for unrelated reasons, they continued to communicate on social media.  The boyfriend encouraged the victim to tell the authorities about her allegations against the defendant, and gave her a deadline for doing so.  When the deadline passed, the boyfriend told his therapist about the allegations, who reported the information to the New Hampshire Division for Children, Youth and Families (DCYF).  When the police and DCYF social workers went to the family's home to interview the victim, she initially told them, "I know why you're here but it's not true," but later told them the defendant had sexually assaulted her.  In December 2016, the defendant was indicted on six counts of aggravated felonious sexual assault, two counts of attempted aggravated felonious sexual assault, and two counts of felonious sexual assault.  During the trial, the State nolle prossed one of the aggravated felonious sexual assault indictments.

Prior to trial, the defendant filed a motion in limine to preclude admission of a printed image of a screenshot of Facebook messages the victim allegedly sent to the boyfriend.  The image was of a screenshot the victim took of an exchange between her and the defendant on Facebook Messenger. According to the motion, the victim sent this screenshot to the boyfriend, deleted it from her phone, and later asked the boyfriend to send it back to her. At the hearing on the motion, the defendant submitted the screenshot reflecting the following:

| | |
|---|---|
| Dad: | My dick is |
| | Wanna see |
| Account owner: | No |
| Dad: | Liar |
| Account owner: | No |
| Dad: | Yup |
| Account owner: | Please stop. |

2

In a written order issued prior to trial, the trial court denied the defendant's motion, stating, in part:

> Upon review, the Court concludes that the State has offered sufficient evidence to support a finding that the evidence in question is what it claims to be. In support of authentication, the State proffered [that the victim] will testify that she received messages like this from defendant routinely, this is the way he communicated with her regularly, that he sent many messages to her from this account, the avatar on the messages is the photograph the defendant used for his Facebook account around the same time, and that she was the recipient of this message. [The victim] will also testify that she took a screen shot of these messages and sent it to [the boyfriend]. [The boyfriend] will testify that he received this screenshot from [the victim] and that he still has this screen shot. The Court concludes that this is sufficient to support a finding that the messages are messages from the defendant, and the ultimate determination of the author of the messages is left to the jury.

A photograph of the screenshot was ultimately admitted into evidence at trial as State's Exhibit 1.

The State called four witnesses at trial—the victim, the boyfriend, and two of the investigating officers. The victim testified that the defendant regularly sexually abused her from the age of 11 or 12 until she was approximately 16. She estimated that the defendant forcibly had sexual intercourse with her 30 times, forced her to perform oral sex on him 25 times, and forcibly performed oral sex on her 10 times. She testified that she mentioned the abuse to her mother when she was 12 or 13 years old and her mother asked her "what [she] wanted to do." The victim testified that her mother told her that "[the defendant] has a lot of health issues" and "that's why he would do something like that." The victim also testified that as a consequence of that conversation, she was "scared" to report the abuse to any figure of authority, because if "her mom doesn't do anything about it, why would anybody else." In addition to the sexual abuse, the victim testified that she communicated with the defendant on Facebook "multiple times a day," and that he would "send [her] pictures of pornography, video links to different pornography sites, [and] messages relating to him wanting to have sex." The victim also testified that because the defendant had her username and password, he was able to delete the messages after she read them.

According to the testimony of one of the investigating officers, the victim had informed the police that she received messages or images via text message or through Facebook Messenger, that she did not have any of the phones that she received messages on, and that she did not keep any of the messages on

3

Facebook Messenger that she had received from the defendant. When the investigating officer was asked on cross-examination whether he knew that it was possible to get photos and messages that have been deleted, he explained, "not from Facebook Messenger. Facebook does not hold on to that. So once somebody deletes something from their Facebook account, it's gone."

The victim testified that she eventually told the boyfriend about the sexual abuse and sent him a screenshot of messages the defendant had sent to her on Facebook. She identified State's Exhibit 1 as "the message [the defendant] had sent [her]" and as the "screenshot that [she] had sent [the boyfriend]." She testified that she knew from the screenshot that the defendant sent the messages because of "the photo icon next to each message that [the defendant] had sent." The photo icon was the "profile picture of the [defendant's] Facebook profile," and was a "picture taken of [the victim], [her] mother, and [the defendant] at a Halloween party."

The boyfriend testified at trial regarding an incident that occurred while he and the victim, who were dating at the time, were watching a movie at her home. He and the victim were sitting together on the couch when a notification appeared on her phone containing a pornographic picture of two people having sex. When the victim opened her phone, he "could see it was from [the defendant]." He asked about the picture, but the victim "just shut [him] down and dismissed all [his] questions," and told him to "just leave it alone." Several months later, however, the victim "broke down and told [him] that [the defendant] had raped her." The boyfriend also testified that he received a screenshot of a message thread, and that the cell phone pictured in State's Exhibit 1, the screen of which depicted the screenshot the victim sent him, was a photograph of his cell phone. He stated that he recognized the avatar next to the messages sent by the defendant as the defendant's "profile picture," which was a picture of the victim, her mother, and the defendant on Halloween. He recognized the picture because "[he] was with them on Halloween" and might have taken the picture himself.

The defense did not call any witnesses at trial, but challenged the victim's credibility on cross-examination. In doing so, counsel established that the victim had numerous opportunities to report the abuse, but did not do so, that the victim had alleged that the defendant's cousin had sexually assaulted her, and that the cousin was tried and had been acquitted. Defense counsel also asserted that the victim had accused the boyfriend of rape, and confronted her with messages in which she appeared to allege that the boyfriend had raped her. In addition, defense counsel cross-examined the victim about a specific incident the victim had discussed during her Child Advocacy Center interview. She had reported during the interview that she was on a couch watching a movie and was seated between her mother and the defendant when the defendant put his hands down her pants and moved them toward her

4

crotch area.  The victim reported that she tried to pull away, but the defendant held her down and put his fingers in her vagina.  During cross-examination, defense counsel pointed out that the victim's mother was "sitting right next to [her]" while this was happening, and somehow "didn't know it was happening."

The jury convicted the defendant on nine charges, and the defendant appealed.  While the appeal was pending, the defendant filed a motion for a new trial in superior court, and the direct appeal was stayed pending the superior court's resolution of the motion.  The superior court subsequently denied the motion for a new trial, and the defendant filed a discretionary appeal, which we accepted and consolidated with his direct appeal.

## I.  Motion in Limine

We first address the defendant's argument that the trial court erred when it denied his motion in limine to preclude the admission of State's Exhibit 1. The defendant argues that the photograph of the screenshot should not have been admitted because: (1) it was not properly authenticated under New Hampshire Rule of Evidence 901(a); and (2) it violated the best evidence standards of New Hampshire Rules of Evidence 1002 and 1003.

The defendant argued in his motion in limine that the State could not prove that the defendant was the individual who sent the message, and nothing in the content of the message suggested that the defendant had authored it. The defendant also argued that the evidence should be excluded because the image was part of a broader conversation, and it was possible that the broader conversation could be exculpatory or "show the available part of the conversation in a different context."

We generally review evidentiary rulings to determine whether the trial court unsustainably exercised its discretion in admitting or excluding evidence. See State v. Brown, 175 N.H. 64, 66 (2022).  The defendant nevertheless asserts that the trial court's ruling was based solely on its interpretation of the rules of evidence and not on any factual determination, and, therefore, we should review the decision de novo.  We recognize that there may be some circumstances in which de novo review of an evidentiary ruling is appropriate. See, e.g., State v. Jesenya O., 514 P.3d 445, 448 (N.M. 2022) (court reviews "de novo the threshold legal question as to the proper framework within which to analyze a particular evidentiary issue"); State v. Saucier, 926 A.2d 633, 641 (Conn. 2007) ("[t]o the extent a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary"). However, we agree with the State that the defendant has not identified any language from the rules of evidence that the trial court interpreted.  Nor has the defendant asserted that the trial court applied the wrong framework within which to analyze the evidentiary issues in this case.  The defendant's

5

arguments are grounded in whether the facts are sufficient to support the trial court's finding that the Facebook messages were sufficiently authenticated and did not violate the best evidence rule or New Hampshire Rule of Evidence 106. Accordingly, we review the trial court decision to determine "whether the record establishes an objective basis sufficient to sustain the discretionary decision made." Brown, 175 N.H. at 66. "To show an unsustainable exercise of discretion, the defendant must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. "Because we are reviewing the trial court's pretrial rulings, we limit our review to the proffers presented to the court at the pretrial motion hearing." Id.

A. Authentication

New Hampshire Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." N.H. R. Ev. 901(a). The bar for authentication of an exhibit is not particularly high, and the proponent need not rule out all possibilities inconsistent with authenticity, or prove beyond any doubt that the evidence is what it purports to be. State v. Strangle, 166 N.H. 407, 409 (2014). The proof necessary to connect an evidentiary exhibit to a defendant "may be made by circumstantial evidence," and the State need only demonstrate "a rational basis from which to conclude that the exhibit did, in fact, belong to" the defendant. State v. Reid, 135 N.H. 376, 383 (1992) (quotation omitted).

As one court recently observed:

With the increased use of social media evidence in litigation, courts nationwide have grappled with the question of whether the authenticity of evidence from social media platforms is properly measured under the traditional rules of authentication found in Federal Rule of Evidence 901 and its many state counterparts . . . or instead, whether judicial concerns over the increased dangers of falsehood and fraud posed by the relative anonymity of social media evidence warrant the adoption of heightened authentication standards.

Jesenya O., 514 P.3d at 449. We addressed this question in State v. Palermo, 168 N.H. 387, 391 (2015), in which we declined to adopt a heightened standard of authentication after concluding that "our established rules governing authentication [were] sufficient" to address the authentication of Facebook messages in that case.

At issue in Palermo were messages the defendant had sent from a Facebook account the victim's son had set up for the defendant on the family's

6

iPad. <u>Palermo</u>, 168 N.H. at 391-94. Prior to trial, the defendant sought to exclude evidence of the messages unless the State could properly authenticate them. <u>Id</u>. at 391. The State proffered that the victim's son would testify that

> (1) he took the defendant's photograph after the defendant moved in with his family; (2) he created a Facebook account for the defendant using the defendant's photograph; and (3) he showed the defendant how to use the family's iPad and the Facebook website. In addition, the State proffered that it would present evidence that the defendant used the iPad around the time the messages were sent, that the messages were sent from the iPad, and that the defendant's release from prison and subsequent arrival at the victim's home coincided with the creation of the Facebook account. The State also asserted that it would present evidence that the messages contained information only a few individuals would know and that the information pertained specifically to the defendant's conduct.

<u>Id</u>. at 393. We noted in <u>Palermo</u> that "[a]lthough Rule 901(a) requires the proponent to present evidence of authenticity, the rule does not establish formal requirements as to the nature or quantum of proof." <u>Id</u>. at 392. Rule 901(b), however, provides a non-exhaustive list of examples of methods of authentication or identification that conform to the requirements of Rule 901(a). Examples include:

> (1) <u>Testimony of a Witness with Knowledge</u> – Testimony that an item is what it is claimed to be.
> . . . .
> (4) <u>Distinctive Characteristics and the Like</u> – The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

N.H. R. Ev. 901(b)(1), (4). Considering the facts presented in <u>Palermo</u> in light of these examples, we concluded that the State's proffered authentication evidence "contained sufficient identifying details to link the authorship of the messages to the defendant." <u>Id</u>. at 393.

In the present case, the State proffered at the hearing on the motion <u>in limine</u> that the victim would testify that she was the recipient of the message, that she communicated with the defendant frequently over Facebook, that he had sent her many messages similar to the ones depicted in the screenshot, and that she sent the screenshot to the boyfriend. The State proffered that the victim would also testify that the avatar on the messages is the photograph the defendant used for his Facebook account around the same time. In addition, the State proffered that the boyfriend would testify to receiving the screenshot

from the victim.  Considering these facts in light of the examples set forth in Rule 901(b)(1) and (4), we conclude that the State provided sufficient evidence to establish the <u>prima</u> <u>facie</u> case required for authentication.  <u>Brown</u>, 175 N.H. at 68-69.

The defendant argues that the evidence was insufficient to support a finding that he sent the messages because: (1) the evidence did not indicate the username from which the messages were sent; and (2) the messages themselves did not indicate that the defendant was the author.  We disagree. As we have noted, while the username is not indicated, the messages were sent from a Facebook account with the same profile picture the defendant used on his Facebook account.  The defendant points to case law stating that evidence that a defendant's name is written as the author of an email or that the electronic communication originates from an email or social networking site is, alone, not sufficient to authenticate the communication as having been sent by the defendant.  <u>See</u> <u>Commonwealth v. Purdy</u>, 945 N.E.2d 372, 381 (Mass. 2011); <u>Tienda v. State</u>, 358 S.W.3d 633, 641-42 (Tex. Crim. App. 2012).  We recognize, as the court of appeals stated in <u>Tienda</u>, "[t]hat an email on its face purports to come from a certain person's email address, that the respondent in an internet chatroom dialogue purports to identify himself, or that a text message emanates from a cell phone number assigned to the purported author – none of these circumstances, without more, has typically been regarded as sufficient to support a finding of authenticity."  <u>Tienda</u>, 358 S.W.3d at 641-42. "[A]s with the authentication of any kind of proffered evidence, the best or most appropriate method for authenticating electronic evidence will often depend upon the nature of the evidence and the circumstances of the particular case." <u>Id</u>. at 639.

In this case, while the messages themselves did not indicate that the defendant was the author, the State proffered at the hearing that the victim would testify that she received messages like this from the defendant routinely, this is the way he communicated with her regularly, and that he sent many messages to her from this account.  We conclude that this evidence is sufficient to support a finding that the item is what the State claims it is.  <u>See</u> <u>Webb v. State</u>, 339 So. 3d 118, 126-29 (Miss. 2022) (trial court did not abuse its discretion in admitting screenshots taken of Snapchat messages between defendant and victim where victim testified about participating in the communications captured in the screenshots and that they were a true and accurate depiction of her snapchat conversations with defendant); <u>People v. Rodriguez</u>, 190 N.E.3d 36, 38 (N.Y. 2022) (trial court did not abuse its discretion in admitting screenshots of text messages where victim testified that screenshots fairly and accurately represented text messages sent to and from defendant's phone); <u>State v. Tieman</u>, 207 A.3d 618, 621-22 (Me. 2019) (trial court did not err in its determination that a Facebook Messenger conversation was authenticated through the testimony of the person with whom the

deceased victim was communicating); Branch v. State, 863 S.E.2d 349, 353-54 (Ga. Ct. App. 2021) (court held that the State made a prima facie showing that text and Facebook messages were what they purported to be through testimony of the victim who identified the various messages sent by the defendant to her); Strunk v. State, 44 N.E.3d 1, 5 (Ind. Ct. App. 2015) (trial court did not abuse its discretion when it admitted a message defendant sent to victim via Facebook where victim testified she had communicated with defendant using same profile page on previous occasions, knew it was the defendant's page because of the profile picture, and knew the screenshot was defendant's Facebook profile because they had two mutual friends, one of whom was the victim's mother, and victim's mother also identified page as defendant's Facebook profile).

Neither of the cases the defendant cites in his brief supports a different result. The defendant in Griffin v. State, 19 A.3d 415, 417 (Md. 2011), challenged the authenticity of pages that allegedly were printed from his girlfriend's MySpace profile. The State introduced the printed pages, not through the testimony of the girlfriend, but through the testimony of the lead investigator in the case who testified that he went to the internet and downloaded a page with a photograph of the girlfriend and the defendant on the front that had a reference to "the children" and the girlfriend's birthdate. Id. at 418. On appeal, the court held that there were insufficient "distinctive characteristics" on a MySpace Profile to authenticate the printout because someone other than the girlfriend could have created the site and posted the message at issue. Id. at 424. Similarly, at issue in United States v. Vayner, 769 F.3d 125 (2d Cir. 2014), was a printout of what the government asserted was the defendant's profile page from a Russian social networking site. Vayner, 769 F.3d at 128. The court held that the trial court had abused its discretion in admitting the webpage because there was no evidence that the defendant had created the page or was responsible for its contents. Id. at 131. In the present case, by contrast, the State proffered that the victim would testify that she was the recipient of the message, that she communicated with the defendant frequently over Facebook, that he had sent her many messages similar to the ones depicted in the screenshot, and that the avatar on the messages is the photograph the defendant used for his Facebook account around the same time.

B. Best Evidence and Completeness

The defendant next argues that the trial court erred in admitting the photograph of the screenshot of the text messages because it failed to satisfy the best evidence rule for two reasons: (1) it was so far attenuated from the messages the victim received that "it cannot reasonably be said" to be "an original or duplicate of those messages"; and (2) it consisted of only part of a conversation, and was "devoid of relevant context." Assuming, without

9

deciding, that the issue was preserved, we conclude that the trial court did not unsustainably exercise its discretion in admitting the photograph of the screenshot into evidence.

The best evidence rule originated at common law to "guarantee against inaccuracies and fraud by insistence upon production of original documents." N.H. R. Ev. 1001 Reporter's Notes. It has been codified at New Hampshire Rules of Evidence 1001 to 1008. Id. The rule states that an "original" writing, recording, or photograph is required to prove the content of a writing, N.H. R. Ev. 1001, but that a "duplicate" may be admitted "to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." N.H. R. Ev. 1003. "For electronically stored information, 'original' means any printout—or other output readable by sight—if it accurately reflects the information." N.H. R. Ev. 1001(d). A "duplicate" is a "counterpart produced by a mechanical photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." N.H. R. Ev. 1001(e).

Neither party disputes that the Facebook messages constitute "writings" for the purposes of the best evidence rule. Furthermore, because "[a] screenshot is an image created by copying part or all of the display on a computer screen at a particular moment," Commonwealth v. Talley, 265 A.3d 485, 534 (Pa. 2021) (quotation omitted), whether or not it is an "original" in the sense that it is "other output readable by sight," it certainly is a "duplicate" because it has been "produced by a[n] . . . electronic process." N.H. R. Ev. 1001(d), (e). We understand the defendant to argue that the duplicate should not have been admitted because: (1) "a genuine issue was raised about the original's authenticity"; and (2) the screenshot did not contain certain metadata indicating the date and time the screenshot was created or the device used to create it. We also understand the defendant to argue that it was unfair to admit the evidence because it was incomplete. We are unpersuaded by these arguments.

As we have noted, the best evidence rule was designed to guard against inaccuracies and fraud. State v. Leith, 172 N.H. 1, 9 (2019). "'The purpose of the rules requiring the production of original writings is simple and practical. That purpose is to secure the most reliable information as to the contents of documents, when those terms are disputed.'" Id. (quoting McCormick on Evidence § 243.1, at 173 (7th ed. 2013) (brackets omitted)). As was stated recently by the Supreme Court of Pennsylvania, "[a] screenshot is a photographic process that produces an exact copy of whatever content appeared on a digital device at the time it was taken. Typically, it guarantees precision and does not suffer from the inaccuracy that the rule seeks to prevent." Talley, 265 A.3d at 535. The defendant in Talley had argued that the best evidence rule precluded introduction of a screenshot of certain text

10

messages.  Id. at 531-32.  He did not argue that the screenshotting process altered the words contained in the messages, but instead challenged "the omission of certain digital information from the trial exhibits—the metadata." Id.  The Pennsylvania Supreme Court rejected this argument, noting that "these are not the kinds of inaccuracies with which Rule 1001(e) is concerned. Rather, the rule seeks to abate dangers of mistransmission and fraud.  But [the defendant] has not established that screenshotting is a method that presents such dangers in theory or in fact."  Id.  We find this reasoning persuasive, and that it extends to a photograph of a screenshot.

The defendant, like the defendant in Talley, challenges the omission of certain metadata that might have supported or refuted the authenticity of the messages.  He does not assert that the screenshotting or photographing process altered the words contained in the text messages.  As discussed above, however, the State proffered that the victim would testify that the messages in the screenshot were as they appeared on the display of her cellphone when she received them.  Accordingly, we conclude that the defendant failed to raise a "genuine question" regarding the "original's authenticity" or to identify circumstances that make it "unfair to admit the duplicate."  N.H. R. Ev. 1003.

Furthermore, that the evidence "constituted merely a fragment" of the conversation does not alter our analysis.  The defendant does not argue that the words that appeared on the screen in State's Exhibit 1 were not accurate. Rather, he asserts that the introduction of the complete conversation "might well have been exculpatory," because it could have indicated that the defendant believed that he was sending the message to his wife, and not the victim.  We disagree that either the best evidence rule or New Hampshire Rule of Evidence 106 required the State to introduce the entire conversation.  Cf. State v. Mrza, 926 N.W.2d 79, 88 (Neb. 2019) (stating that "the rule of authentication did not require State to offer [into evidence] all of the Snapchat messages" between the defendant and the victim").

## II. Motion for a New Trial

Following his conviction, the defendant filed a motion for a new trial, asserting that his trial counsel provided ineffective assistance of counsel.  On appeal, the defendant challenges the trial court's conclusion that his attorneys' decision not to call the mother of the victim to testify at trial did not constitute ineffective assistance of counsel.

Part I, Article 15 of the New Hampshire Constitution and the Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant reasonably effective assistance of counsel.  N.H. CONST. pt. 1, art. 15; U.S. CONST. amends. VI, XIV.  To prevail upon his claim of ineffective assistance of counsel, the defendant must demonstrate, first, that

his trial attorneys' representation was constitutionally deficient and, second, that their deficient performance actually prejudiced the outcome of the case. State v. Fitzgerald, 173 N.H. 564, 573 (2020). The ineffective assistance of counsel analysis involves mixed questions of law and fact. Id. at 574. We will not disturb the trial court's factual findings unless they are not supported by the record or are erroneous as a matter of law, but we review the ultimate determination of whether each prong is met de novo. Id. Because the standard for determining whether a defendant has received ineffective assistance of counsel is the same under both the State and Federal Constitutions, we examine the constitutional competency of counsel's performance under the State Constitution, and rely upon federal case law only for guidance. Id. at 573.

To satisfy the first prong, the performance prong, the defendant "must show that counsel's representation fell below an objective standard of reasonableness." Id. The reasonableness of counsel's conduct is judged based upon the facts and circumstances of the particular case, viewed at the time of the conduct. Id. As has been previously explained,

> Judicial scrutiny of counsel's performance must be highly deferential. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Strickland v. Washington, 466 U.S. 668, 688 (1984); see also State v. Whittaker, 158 N.H. 762, 769 (2009). Because the proper measure of attorney performance remains simply reasonableness under prevailing professional norms, to establish that a trial attorney's performance fell below this objective standard of reasonableness, the defendant must show that no competent lawyer would have engaged in the conduct of which he accuses his trial counsel. State v. Cable, 168 N.H. 673, 680-81 (2016).

We agree with the defendant that the presumption of reasonableness is not absolute, and that "it does not follow necessarily that, in every instance, trial counsel's strategy concerning [whether to call a particular witness] is sound." Bryant v. Comm'r of Correction, 964 A.2d 1186, 1199 (Conn. 2009). But the question of whether trial counsel's decision not to solicit witness testimony can be considered sound trial strategy or whether it constitutes a

12

serious deviation from the actions of an attorney of ordinary training and skill in criminal law is to be determined by the facts of the particular case. Id. at 1194. In this case, while there might have been some benefit to having the mother testify, we cannot say that trial counsel's decision not to have the mother testify was unreasonable, given the potential disadvantages of having her testify. The defendant was represented at trial by two attorneys, one of whom testified at the hearing on the motion for a new trial that the defense ultimately decided not to call the mother for three reasons.

First, counsel expected the jury to find the defendant not guilty, even without the mother's testimony, because they believed they had been successful in discrediting the victim's testimony. They believed that their cross-examination about the assault on the couch in her mother's presence made the claim appear "absurd on its face," which meant it was unnecessary to call the mother to contradict it.

Second, counsel testified that counsel were concerned because the mother "seemed very emotional and frail," and they "worried about what would happen if she were put on the witness stand." When they discussed the matter with the defendant, the defendant "deferred" to his attorneys, but his perspective was that the mother was "hanging on by a thread." Trial counsel testified that they were "on the fence" about calling the mother throughout the trial.

Finally, trial counsel was concerned about a comment the defendant had allegedly made to the victim about shoveling the driveway. At the hearing on the motion for a new trial, the mother of the victim testified that the victim told her that the defendant "told [the victim] that if she would give him a blow job, she wouldn't have to shovel the driveway." When the mother confronted the defendant about that, he stated that he had been misunderstood, and that what he had said to the victim was that the mother did not have to shovel the driveway because the mother gives him sexual favors. Counsel testified at the hearing that this comment, "regardless of the veneer . . . put on it . . . would have been horrible for the jury to hear . . . given what [the defendant] was accused of." According to trial counsel, "even if we were fortunate enough to get in a completely sanitized version of [it]," that is, "I didn't ask for oral sex; I merely told her that she has to do the manual labor rather than her mother because her mother provides me with oral sex . . . that would have been disastrous." Trial counsel's concern was that this "would have introduced this really inappropriate conversation, banter, familiarity with such things between the defendant and the victim," and counsel was surprised that the State did not elicit testimony from the victim about the comment. He stated that he was on the fence about calling the mother at trial but when the State failed to bring up the shoveling incident, "the scales were tipped in favor of not calling her." Trial counsel testified that he believed that the State had made an error by not bringing up the comment, and he did not want to open the door to it.

13

The defendant argues that had she been called to testify, the mother would have "directly rebutted" the victim's claims regarding the family dynamics, and would have testified that she never saw any sexual messages between the victim and the defendant, that the victim never disclosed to her that the defendant had sexually assaulted her, and that she did not recall any incident where she, the defendant, and the victim were on the couch and the victim "fought or squirmed" with the defendant. She would also have testified that it was she, not the defendant, who was ultimately in charge of the victim's social life, undermining the victim's testimony that the defendant bribed the victim to engage in sexual activity by threatening to withhold permission for her to attend social events. In addition, she would have testified to an incident that negatively reflected on the victim's credibility. She would have testified that the victim used makeup to make it appear she had a black eye, and then falsely alleged to a neighbor's daughter that the defendant had punched her.

While the defendant correctly characterizes the nature of what the mother would have testified to based upon the mother's testimony at the hearing on the motion for a new trial, we, like the trial court, are unpersuaded that such testimony would have "directly rebutted" the victim's claims. While the mother might not have seen any sexual messages the defendant sent to the victim, this does not mean that the messages were never sent, as the mother acknowledged that the defendant had passwords to the victim's accounts. In addition, the mother's testimony that she was "ultimately" in charge of her daughter's social life does not directly refute the victim's testimony that the defendant leveraged the victim's social life to extract sexual favors.

While the mother's testimony that she did not recall any "couch incident" would arguably have undermined the victim's credibility, trial counsel vigorously cross-examined the victim about this incident, specifically inquiring of the victim how it could be that her mother was sitting right next to her and did not know it was happening.

Trial counsel carefully balanced the "pros" of the mother testifying against the "cons." Counsel consulted with both the defendant and the mother about the mother testifying, and each opined that she should not testify unless the testimony was necessary. Counsel observed the mother to be emotionally frail, and the defendant stated that the mother was "hanging on by a thread." In addition, counsel was understandably concerned about opening the door to the inappropriate comment the defendant made to the victim about shoveling the driveway. Testimony about the incident would have introduced a conversation of a sexual nature between the defendant and the victim that the jury might have found inappropriate and might have negatively affected the defendant's case. We agree with the trial court that it is inappropriate for the court "with hindsight" to "substitute its judgment for that of trial counsel in

14

determining whether trial counsel should have put [the mother] on the stand and risk introducing this evidence." We are unpersuaded that the defendant has rebutted the strong presumption that trial counsel's decision in this case was sound trial strategy.

Because we agree with the trial court that the trial attorneys' performance was not constitutionally defective, we do not consider the second prong. State v. Collins, 166 N.H. 210, 212 (2014) (stating that failure to establish either prong requires a finding that counsel's performance was not constitutionally defective). Because the standard for determining whether a defendant has received ineffective assistance of counsel is the same under both the State and Federal Constitutions, we reach the same result under the Federal Constitution as we do under the State Constitution. State v. Hall, 160 N.H. 581, 588 (2010).

## III. Review of Confidential Records

Prior to trial, the trial court conducted in camera review of a number of records. It is unclear from the trial court's orders whether there were records that were reviewed but not disclosed. When the trial court conducted its in camera review, it did not have the benefit of our opinion in State v. Girard, 173 N.H. 619 (2020). We agree with the parties that this case should be remanded for the purpose of having the trial court review any undisclosed records again, in accordance with the standard set forth in Girard. Prior to conducting this review, the trial court may seek input from the parties regarding what information is potentially exculpatory to the charged crimes or to the victim's general credibility. If the trial court concludes that the records do contain evidence that should have been disclosed to the defense, the court may release that evidence to the parties with any necessary protective order, taking into account the victim's rights under Part I, Article 2-b of the New Hampshire Constitution and RSA 21-M:8-K (Supp. 2022), if any. If the court releases any evidence to the parties, the court should then provide the parties with an opportunity to make arguments as to whether a new trial is warranted. Cf. Graham, 142 N.H. at 364 (if records contain evidence that should have been disclosed, the trial court "should order a new trial unless it finds that the error of not admitting the evidence in the first trial was harmless beyond a reasonable doubt").

Affirmed in part and remanded.

BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

15